L. T. Lewis *et al.*, Complainants, Appellees, *v.* Nashville Gas & Heating Co., Defendant, Appellant.

(*Nashville*, December Term, 1930.)

Opinion filed February 7, 1931.

ROBERTS & ROBERTS, EDWIN A. PRICE and PITTS, Mc-CONNICO & HATCHER, for complainants, appellants.

J. WASHINGTON MOORE, J. CARLTON LOSER and CHAS. GILBERT, for City.

L. D. SMITH and ROY H. BEELER, for R. R. & Pub. Utilities Commission.

MR. JUSTICE COOK delivered the opinion of the Court.

The Nashville Gas and Heating Company was incorporated July 5, 1911, for the purpose of establishing gas works and supplying gas to the inhabitants of Nashville. The charter of incorporation was authorized by chapter 142, Acts of 1875, chapter 176, Acts of 1887, and chapter 70, Acts of 1889. Conditions annexed to the corporate franchise by these statutes were, first, that no one of the city streets or alleys of said city shall be entered upon or used by said company for laying pipes and conductors or otherwise until consent of the municipal authorities shall have been first obtained and an ordinance shall have been passed prescribing the terms on which same may be done.

Second, the company could not acquire the franchises of another company "except by and with the approval and consent expressed officially in writing, of the municipal government in which such corporations are located or carry on their business, wholly or in part, and then only upon such terms and conditions as the said municipal governments may respectively prescribe, provided that such terms and conditions shall not violate any law."

Chapter 204, section 15, Acts of 1899, chapter 119, Acts of 1903, amending chapter 114, Acts of 1883, incorporating the City of Nashville, among other things, provided:

"That every ordinance involving the granting by the city of any franchise, or amendments to existing franchises, for the supply of light or water, for the lease or sale of any public utility, for the exemption of any *quasi*-public corporation, for duties imposed upon it by its charter or by the law of the land or involving the granting by the city of any right of way over, through, or under its streets, alleys, avenues, or property, to any street railroad, telephone, telegraph, gas, electric light, or other companies, must be submitted to the qualified voters of such city at a special election to be called for that purpose."

It is stated in the bill that soon after the gas company obtained its charter negotiations between the officials of the company and the City of Nashville resulted in an agreement embodied in Ordinance 155, through which the gas company acquired the right to lay its pipes under the streets. Section 14 of the ordinance reads:

"That in consideration of the rights and licenses hereby granted to the Nashville Gas & Heating Company, and in addition to the payment required to be made as hereinbefore provided in Section 12, said company shall pay to the Mayor and City Council of Nashville five per centum (5%) of its gross receipts from the sale of gas, and also from the sale, at a fair market value of by-products, unless and until said Mayor and City Council of Nashville—and the voters of the City at an election held for such purpose according to the provisions of the

law, shall ratify such, grant a license or right to any other company to engage in the same or a similar business to that of the Nashville Gas & Heating Company, and such other company shall actually engage in business or the city itself engage in such business, at which time all payments provided for in this section shall cease; provided, that nothing herein contained shall be construed to prevent the city from granting a license or right to a natural gas company."

By chapter 49, Acts of 1919, the State, through the Railroad and Public Utilities Commission, assumed power to regulate the rates of public utility companies. In fixing the rate charged for gas in the City of Nashville, the Railroad and Public Utilities Commission recognized, in fixing the rate base, the payments required by section 14 of Ordinance 155.

The complainants, residents of the City of Nashville and vicinity, on behalf of themselves and others similarly situated, filed the original bill attacking section 14 of the ordinance and asked for a decree declaring it void. The gas company, by answer and cross bill, joined the complainants in the attack upon section 14, saying the charge therein made it discriminatory because not extended to other like public utilities, that it deprives the gas company of its customers and its property contrary to the law of the land, that the city had no power to impose the charge, or if it could have been made when the ordinance was passed, it was annulled by chapter 49, Acts of 1919, and also by subsequent revenue and taxing laws.

The gas company prayed for a decree declaratory of its rights, duties and obligations under the ordinance and particularly section 14.

The city demurred to the original and cross bills. The chancellor overruled the demurrers and declared section

14 of the ordinance void; if not originally void that it was abrogated by subsequent statutes. The city appealed. Its several assignments of error and the responses of appellees present these determinative questions:

(1) Whether the payments provided for in section 14 of the ordinance were imposed by the city in the exercise of its governmental power, either to tax or to regulate.

(2) If neither, the imposition of a tax nor a regulation under the police power, then whether it was a valid charge assented to by the gas company as a condition annexed to the franchise through which the gas company was permitted to enter the city.

(3) If a valid charge when made, was the provision of section 14 of the ordinance annulled by the legislature through a subsequent exercise of the taxing power or an exercise of the police power in prescribing rates to be charged by the gas company.

The control of streets and highways, primarily in the State, could be vested in the State's subordinate agencies, the municipalities and counties. That was done under Acts incorporating the City of Nashville through section 114, Acts of 1883, and subsequent amendatory Acts.

In *Humes* v. *City of Knoxville* a municipality was declared to be the proprietor of its streets, holding them in trust as easements for the convenience of its citizens. See also *Nashville* v. *Brown,* 9 Heisk., 1.

The legislature could have empowered the gas company to exercise its rights under franchise without permission from the city. (*Railroad* v. *Adams,* 3 Head, 596.) Or could have made the franchise of the gas company dependent upon such conditions as the city might impose. *Railroad* v. *Brigham,* 87 Tenn., 527; *City of*

*Memphis* v. *Memphis Water Co.*, 5 Heisk., 494; *Memphis City Railroad Co.* v. *Memphis*, 4 Cold., 406.

■ The legislature withheld the power from the gas company to enter the city and made entry dependent upon consent of the city as in *Railroad* v. *Memphis*, 3 Shan. Cas., 193, and *Knoxville* v. *Africa*, 77 Fed., 501. The State had not then assumed direct control over public utilities. Local autonomy was generally recognized and the right of *quasi*-public corporations to exercise their franchises and the regulation of them was, for the most part, left to the several municipal governments to be served by them. This was done sometimes under express grant of power from the State and sometimes through contract with the utility annexed as a condition to the right of franchise.

■ Under the statutes referred to, the gas company's franchise was dependent upon approval and consent of the municipal government and upon such terms and conditions as it might impose. The power to assent and impose conditions thus recognized by the legislature carried with it the correlative right of the city to make terms and impose conditions. *Railroad* v. *Memphis*, 3 Shan. Cas., 193; *Blair* v. *Chicago*, 201 U. S., 400; *Portsmouth* v. *Virginia*, 39 A. L. R., 1512.

The annual payments which the gas company agreed to make to induce the city to let it in and to use then existing and subsequently extended streets were not exacted through the exercise of governmental power. The provision of section 14 of the ordinance requiring these payments was the result of negotiations, culminating in a contract between the city acting in its corporate and proprietary capacity and the gas company exercising also its power to contract. 44 C. J., 997.

■ The Constitution of this State and no statute limited or restrained either the city or the gas company in the exercise of their contractual powers. Both parties could contract and the city was expressly authorized to prescribed the conditions and terms upon which the gas company might exercise its franchise within the city limits.

The contract was not *ultra vires*. The exercise of the right of contract by the municipality is not to be confused with the limited power of sovereignty delegated to municipal corporations. They are dual entities possessing both corporate and limited governmental power. As an agency of the State, the municipality could exercise such governmental power as was delegated to it. As a corporate entity endowed with proprietary or corporate rights, it could, to a certain extent, contract. 43 C. J., 179; *Illinois Trust & Savings Bank* v. *Arkansas City*, 34 L. R. A., 524; *Omaha Water Co.* v. *Omaha*, 12 L. R. A. (N. S.), 736.

Until the State assumed control, in the exercise of the police power, of its rate making function, the power of regulation was often exercised by the municipal corporations where utilities companies were located. In the absence of separate statutory power to regulate rates, it was sometimes done through contract with the utility company. Tiedeman on Municipal Corporations, sec. 163.

There runs through the cases a well defined distinction between the authority of corporations to regulate rates, through exercise of the police power delegated by the State, and the authority to make a contract with the utility company involving the rate to be charged for service. The same distinction appears in cases involving contracts through which the municipality as proprietor of its streets

exacted payment from a public utility as a condition precedent to the exercise of its franchise by entry into the city and use of the public streets.

The want of power to fix rates by ordinance, like the want of power to tax for purpose of revenue, did not, under prior laws, preclude a municipality from exercising its power to contract with the utility concerning rates or for payments for use of the streets, and exercise of the franchise by the public utility being dependent upon consent of the municipality, the grant by the city was sufficient consideration for the contract; and assent and acceptance by the utility company was binding alike upon the municipal corporation and the company.

But the regulation of rates, however accomplished, was subject to the continuing police power of the State which, in the exercise of its sovereignty, could cancel the conditions that had permitted the municipality to prescribe rates. *City of Memphis* v. *Enloe*, 141 Tenn., 618; *Atlantic Coast El. Co.* v. *Board*, 12 A. L. R., 737.

The provisions of sections 8 and 9 of Ordinance 115 became nugatory upon resumption by the State of the power to regulate rates by chapter 49, Acts of 1919. In order to meet changed conditions, the State probably could have suspended the contract embodied in section 14 of Ordinance 155, but it was not done. The contract therein embodied was recognized and preserved by an express declaration in section 11 of chapter 49, Acts of 1919, where it is declared:

". . . that no provision of this section or of this entire Act shall be construed to alter or impair any existing contract between any public utility and any municipality whereby it has been agreed that any payments of money, in addition to proper *ad valorem* taxes, shall be

made by any such public utility to or for the benefit of any such municipality or its people, but all such things, involving the cost of the service, shall be taken into consideration by the commission in exercising its power to pass upon the reasonableness of any rate, fare or charge hereafter to be made by such public utility.''

The contract embodied in section 14 of the ordinance and recognized by the foregoing provision of the Act of 1919 speaks for itself. The charge that the annual payments which the gas company agreed to make in consideration for the franchise and the right to lay its pipes under the city streets was a tax or an inspection fee would not make it so. The fact that the city obtained money which it could use as revenue does not determine the character of the charge or make it a tax. *City of St. Louis* v. *Western U. Tel. Co.,* 148 U. S., 92.

The city was authorized by statute to prescribe the terms and conditions upon which the gas company might enter and establish its business. That, it appears, was done through negotiations with the gas company, and the obligation, voluntarily assumed by it, was not the result of the exercise of a governmental power but of contract which both parties could make (*City of Lancaster* v. *Briggs,* 96 S. W., 413), and the annual payments prescribed by section 14 of the ordinance were compensation to be paid the city for the exercise of the franchise, conditionally granted by the State, subject to assent of the city as proprietor of its streets. Among others, this proposition is well supported by the following authorities: *Hanford Gas Co.* v. *City,* 163 Calif., 108; *Byrne* v. *Chicago,* 169 Ill., 75; *Alleghany City* v. *Railway,* 159 Pa. St., 411; *City of Mitchell* v. *Dakota Telephone Co.,* 127 N. E., 582; *Jamestown* v. *Home Telephone Co.,* 109

N. Y. Supp., 297; *Portsmouth* v. *Virginia Railway*, 39 A. L. R., 1510. See also 19 R. C. L., p. 1153, Section 427, where it is said:

"One of the conditions which a municipal corporation can lawfully attach to the grant of a franchise is the payment of money; and the payment need not be such as is imposed upon all others similarly situated, as in the case of a tax, or the equivalent of the cost of inspection and replacement, as in the case of a license fee imposed under the police power, but may be a definite sum arbitrarily selected, and if the company does not wish to pay it it need not accept the franchise."

▋ The gas company having voluntarily obligated itself, as provided in section 14 of Ordinance 155, the continued exaction of the payments thereunder violates no right guaranteed by the State or the Federal Constitution. Nor is any constitutional or statutory right of the complainants violated. They are not parties to the contract and are under no obligation to make payments either to the gas company or the city in consequence of it. As users of gas they are volunteers.

▋ The court is without authority to annul a valid contract as a means of reducing rates to the consumers of gas. That the contract embraces receipts for gas consumed by persons beyond the city limits would not authorize an attempted allocation of receipts from gas consumers within the city as the basis for the annual payments which the gas company agreed to make. The earnings are necessarily dependent upon the franchise granted by the city which could not be exercised without using the streets.

It is not necessary to enter upon an extended discussion of an exercise of the police power and the taxing power. These powers belong to the State and can only be exer-

cised by agencies of the State under an express delegation of authority.

Since the payments prescribed by section 14 of the ordinance result from the contract voluntarily engaged in and which both parties could make, the question as to an exercise of governmental power by the city is not involved. *Shelby Co.* v. *Telephone & Tel. Co.*, 140 Tenn., 86; *Nebraska Telephone Co.* v. *Lincoln*, 28 L. R. A. (N. S.), 221, and similar cases involving attempts of governmental agencies to exercise the taxing power or the police power are not applicable, because, as we have stated, the exaction concerning which complaint is made was not through an attempt to exercise either the taxing power or the police power.

In *Shelby County* v. *Telephone & Tel. Co., supra,* the county granted a franchise to the telephone company as far back as 1883. In 1907 the county court passed a resolution requiring the telephone company to reduce its rates and to properly locate its poles along the highway, or, in the alternative, to pay an annual rental of one dollar per pole. In denying the power of the county to impose this pole rental, the court said that the rental was imposed as a penalty for bad service and high rates and held that the quarterly court was without power to regulate either the service or the rates. Allusion in the opinion to cases holding that municipalities may levy a charge under the police power for inspection and service, provided such power was given by the State bears no relation to the rule that a municipality with power to refuse or give assent may exact as a condition precedent to the grant an annual charge for entering and laying pipes under the streets.

The franchise granted by the City of Nashville to the gas company was not exclusive in the sense that

a monopoly was given to the injury of the public. The right was reserved to grant a franchise to natural gas companies and the city made no attempt to contract away its rights to let in light companies and other like utilities. The principle governing *Richardson Gas & Oil Co.* v. *City of Altoona,* 21 L. R. A. (N. S.), 214, is controlling.

Allusion has already been made to the lack of a justiciable interest on the part of complainants to the original bill. In that connection we may add that no obligation imposed by law or by contract rests upon these complainants. Before the enactment of chapter 49, Acts of 1919, the State permitted the city to prescribe the maximum rate charged consumers by the gas company through contract embodied in sections 7 and 8 of the ordinance. Now the rate is regulated through the Railroad and Public Utilities Commission. At no time, either before or after the Act of 1919, were complainants compelled to respond to a demand of government. Since their rights are not directly affected either by the contract or by any governmental act of the city, they are in no position to seek relief through the courts.

The courts cannot directly or indirectly exercise the rate making power, that is legislative. Neither can the courts abrogate a contract binding when made and recognized by the legislature as binding when the power to regulate public utilities was assumed through the Act of 1919, because a legitimate charge is recognized as a part of the rate making base.

As we have said, the legislature in the exercise of the police power of the State, might have abrogated the contract embodied in section 14 of ordinance 155, but instead of doing so they expressly recognized the right of the city to exact the payments therein provided pursuant to contract with the gas company. The Court can-

not annul the contract thus recognized and continued in force. The city for the benefit of consumers of gas, could by appropriate action relieve the gas company of its contractual obligation, and the Public Utilities Commission could, in their discretion, accordingly reduce the rates. Whatever is done would· be dependent upon action of municipal authorities, followed by appropriate action of the gas company and the Railroad and Public Utilities Commission.

We are constrained, therefore, to reverse the decree of the Chancellor and dismiss the original and cross-bills.