IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
On-Brief February 17, 2004

## BELLSOUTH TELECOMMUNICATIONS, INC. v. CITY OF MEMPHIS, TENNESSEE

**A Direct Appeal from the Chancery Court for Shelby County**
**No. CH-01-1351-3     The Honorable D. J. Alissandratos, Chancellor**

---

**No. W2003-01047-COA-R3-CV - Filed July 12, 2004**

---

Telecommunications corporation appeals trial court's grant of summary judgment to city, alleging that trial court incorrectly determined that city ordinance imposing a charge of five percent of gross revenue of the corporation was not inconsistent with T.C.A. § 65-21-103 or any other provision of Tennessee law.  We reverse.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Reversed**

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which DAVID R. FARMER, J. and HOLLY M. KIRBY, J., joined.

Louis F. Allen and Earle J. Schwartz of Memphis; Guy M. Hicks of Nashville; Dorian S. Denburg of Atlanta, Georgia; John E. Muench and Robert M. Dow, Jr. of Chicago, Illinois for Appellant, BellSouth Telecommunications, Inc.

Robert L. J. Spence, Jr. and Monika L. Johnson; Allan J. Wade and Lori Hackleman Patterson of Memphis; Clarence A. West of Austin, Texas for Appellee, City of Memphis, Tennessee

### OPINION

This case involves cross-motions for summary judgment filed by the appellant, BellSouth Telecommunications, Inc. ("BellSouth"), and the appellee, the City of Memphis, Tennessee ("the City"), regarding the validity and enforceability of city Ordinance No. 4404.  The pertinent factual history is summarized by the parties in their joint stipulations of fact:

> 2.      In January 1879, the Tennessee General Assembly passed the
> Taxing District Act.  Acts Tenn. 1879, Chapter 11, § 1....

3.    Pursuant to the Acts of 1879, Chapter 11, Sec. 3, the State of Tennessee made the following grant to the Taxing District of Shelby County (now City of Memphis):

> The governing authority shall have the power to repair, and keep in repair, streets, sidewalks and other public grounds and places [in the taxing district]; to open and widen streets, to change the location [of] or to close the same, and to lay off new streets and alleys when necessary; and to have and exercise entire control over all streets and other public property of the Taxing District, as well [as] that within and without the Taxing District.

Acts Tenn. 1879, Chapter 11, Sec. 3; Memphis City Charter Sec. 481.

4.    In 1879, the Legislative Council of the Taxing District entered into an agreement with Samuel T. Carnes ("Carnes")....

5.    In 1881, Carnes incorporated Memphis Telephone and Electric Co. and in 1882, Carnes assigned all of the assets of his telephone business to Memphis Telephone & Electric Co. In 1883, Cumberland Telephone & Telegraph Co. ("Cumberland"), a Kentucky corporation, acquired all of the assets of Memphis Telephone & Electric Co.

6.    In 1884, the Tennessee General Assembly passed legislation which was codified at Miliken & Vertrees Tennessee Code, Chapter 8, Section 1535 (1884)....

7.    In 1885, the Legislature enacted Chapter 66, Acts of 1885 (now codified at T.C.A. § 65-21-105, 106, [and] 201)....[1]

---

[1] 1885 Tennessee Public Acts 66, § 1 stated:

> ***Be it enacted by the General Assembly of the State of Tennessee***, That any person or corporation organized by virtue of the laws of this State, or of any other State of the United States, or by virtue of the laws of the United States, for the purpose of transmitting intelligence by magnetic telegraph or telephone, or other system of transmitting intelligence the equivalent thereof, which may be hereafter invented or discovered, may construct, operate and maintain such telegraph, telephone, or other lines necessary for the speedy transmission of intelligence, along and over the public highways and streets of the cities and towns of this State, or across and under the waters, and over any lands or public works belonging to this

(continued...)

8.	In 1891, the Tennessee General Assembly restored the name "City of Memphis by Acts of 1891, Chapter 229, §§ 1-2....

9.	From time to time between 1885 and 1900, Cumberland erected its poles and strung its wires in the City in order to expand its telephone system.

10.	In June 1900, the Legislative Council adopted a "Conduit Ordinance[."][2]

11.	Between 1900 and 1944, the Conduit District established by the Conduit Ordinance was expanded from time to time by resolution of the Legislative Council/Board of Commissioners.

12.	On February 25, 1902, the City passed an ordinance charging telephone and telegraph companies doing business in Memphis a pole rental of $3 per pole per year. In June 1902, the City filed suit against Cumberland to collect this pole rental.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

14.	On July 16, 1903, [t]he City and Cumberland resolved the 1902 litigation in a settlement agreement dated July 16, 1903, signed by Cumberland and the City....

---

[1](...continued)

> State, and on and over the lands of private individuals, and upon, along, and parallel to any of the railroads or turnpikes of this State, and on and over the bridges, trestles, or structures of said railroads; ***Provided***, that the ordinary use of such public highways, streets, works, railroads, bridges, trestles or structures and turnpikes be not thereby obstructed, or the navigation of said waters impeded, and that just damages shall be paid to the owners of such lands, railroads, turnpikes, by reason of the occupation of said lands, railroads and turnpikes, by said telegraph or telephone corporations.

(emphasis in original).

[2] This ordinance created a "Conduit District" wherein telephone and telegraph service providers were prohibited from "constructing such wire lines or any of their poles or appurtenances above the ground in passing along or across such public thoroughfares within the limits to be known as the "Conduit District"...

15. In 1907, the Tennessee General Assembly enacted the Talbert Bill, now codified at T.C.A. § 65-21-103.[3]

16. In March 1913, Cumberland agreed by letter to provide additional telephone equipment to the City of Memphis....

17. In 1915, the City of Memphis and Cumberland entered into an agreement concerning the provision of phone service to the City....

18. In 1919, Cumberland agreed to purchase the exchange and assets of the Memphis Telephone Co.

19. In June 1926, Southern Bell Telephone Co. qualified to do business in Tennessee. Cumberland Telephone & Telegraph Co. conveyed all of its property and assets to Southern Bell and ceased doing business.

20. In July and August 1933, there was an exchange of correspondence between Memphis Mayor Watkins Overton and Southern Bell regarding the 1903 ordinance.

---

[3] The 1907 act was codified at T.C.A. §§ 65-21-101, 103 (1993). Section 65-21-101 states:

> **65-21-101. Special powers of corporations.** – Telegraph and telephone corporations may construct a telegraph or telephone line and erect the necessary fixtures along, or over, or under the line of any public highway, the streets of any village, town, or city, across, or over, or under rivers, or any land belonging to the state, or along, across, or under county roads, and also over the lands of private individuals in pursuance of the general law authorizing the condemnation of the easement of right of way for works of internal improvement as set forth in title 29, chapter 16; provided, that the ordinary use of such public highway, streets, or county road be not thereby obstructed or the navigation of such waters impeded.

Section 65-21-103 further provides:

> **65-21-103. Local regulation.** – While any village or city within which such [telegraph or telephone] line may be constructed shall have all reasonable police powers to regulate the construction, maintenance, or operation of such line within its limits, including the right to exact rentals for the use of its streets and to limit the rates to be charged; provided, that such rentals and limitations as to rates are reasonable and imposed upon all telephone and telegraph companies without discrimination. No village, town, or city shall have the right to prevent the company from constructing, maintaining, and operating the line within the village, town, or city, so long as the line is being constructed, maintained, or operated within the village, town, or city, in accordance with the reasonable police regulations.

-4-

21.     On June 27, 1944, the Board of Commissioners of the City of Memphis enacted Ordinance No. 427.[4]  On July 5, 1944, Southern Bell filed its acceptance of this ordinance....

22.     In September 1944, the Railroad and Public Utilities Commission approved the Ordinance.

23.     In 1961, the Tennessee General Assembly passed Chapter 123 of the Public Acts of Tennessee 1961, amending T.C.A. [§] 65-405. Acts 1961, ch. 123, § 1, codified at T.C.A. § 65-4-105(e).[5]

---

[4] Ordinance No. 427 provided, in pertinent part:

> SECTION 1.  BE IT ORDAINED BY THE BOARD OF COMMISSIONERS OF THE CITY OF MEMPHIS, that the Southern Bell Telephone and Telegraph Company ... be and is hereby granted the privilege to erect, construct, maintain, and operate telephone and telegraph lines, including poles, conduits, cables, fixtures, electrical conductors, and other appurtenances, upon, along, under and over the streets, alleys and other public thoroughfares within the present or future corporate limits of the City of Memphis, for a period of eighteen (18) years, beginning July 1, 1944, and ending June 30, 1962, upon the terms and subject to the conditions and limitations of this ordinance.

> SECTION 2. BE IT IS FURTHER ORDAINED, that in consideration for the privilege herein granted the Southern Bell Telephone and Telegraph Company shall pay to the City of Memphis during said period, a sum equal to four (4%) per cent for the first ten years of said period, and a sum equal to five (5%) per cent for the last eight years of said period, on all gross receipts accruing to its office or offices in Memphis of every kind and character, and from every source, without any deductions, excepting only gross receipts from interstate toll business.

[5] Tennessee Code Annotated § 65-4-105(e) (1993) states:

> Any franchise payment or other payment for the use of public streets, alleys or other public places or any license, privilege, occupation or excise tax payment, which after February 24, 1961, may be made by a utility to a municipality or other political subdivision, except such taxes as are presently provided for under existing statutes and except such franchise payment or other payments as are presently exacted from the utility pursuant to the terms of any existing franchise or other agreement, shall, insofar as practicable, be billed pro rata to the utility customers receiving local service within the municipality or political subdivision receiving such payments, and shall not otherwise be considered by the authority in fixing the rates and charges of the utility.

24.     In February 1962, the Board of Commissioners enacted Ordinance No. 954.  Southern Bell filed its acceptance of this ordinance....[6]

25.     In April 1962, the Public Service Commission approved the ordinance.

26.     In 1962, the City of Memphis filed a lawsuit seeking to prevent Southern Bell from passing through to its Memphis customers, the fee collected pursuant to the 1962 Ordinance.  That lawsuit was resolved by the Sixth Circuit in *Memphis v. Southern Bell Tel. Co.*, 316 F.2d 535 (6th Cir. 1963).

27.     In 1966, the City of Memphis adopted Home Rule pursuant to Art. 11, Sec. 9, of the Tennessee Constitution.

28.     South Central Bell Telephone Company was formed in 1968. In May 1968, Southern Bell and South Central Bell entered into a plan of reorganization under which South Central Bell would acquire the assets and liabilities and conduct the business formerly carried on by Southern Bell in Alabama, Kentucky, Louisiana, Mississippi and Tennessee.  On July 1, 1968, South Central Bell succeeded to the assets, liabilities and business of Southern Bell Telephone and Telegraph Company located, *inter alia*, in Memphis, Tennessee.

29.     In July 1980, the [Memphis] City Council passed Ordinance No. 3037 on third and final reading.[7]  South Central Bell filed its acceptance of Ordinance No. 3037....

---

[6] Ordinance No. 954 established a franchise agreement between the City and BellSouth for the period from July 1, 1962 through June 30, 1980.  The ordinance granted BellSouth the "privilege to construct, maintain and operate telephone and telegraph lines ... upon, along, under and over the streets, alleys and other public thoroughfares within the present or future corporate limits of the City of Memphis...."  Pursuant to the ordinance, BellSouth agreed to pay to the City "a sum equal to five percent (5%) on all gross receipts accruing to its office or offices in Memphis of every kind and character from the telephone subscribers located within the present or future corporate limits of the City of Memphis...."

[7] Ordinance No. 3037 established a franchise agreement granting BellSouth "the privilege to erect, construct, maintain, and operate telephone and telegraph lines ... upon, along, under and over the streets, alleys and other public thoroughfares, within the present or future corporate limits of the City of Memphis...."  The agreement, which extended for a period of twenty years from July 1, 1980 through June 30, 2000, provided that BellSouth "shall pay [to] the City of Memphis during said period a sum equal to five percent (5%) on all gross receipts of every kind and character from the furnishing of telephone service to subscribers located within the present or future corporation limits of the City of Memphis...."

30.     The City and South Central Bell/BellSouth operated under the 1980 Ordinance until it expired, after a one year extension, in 2001.

31.     In December 1991, South Central Bell Telephone Co. changed its corporate name to BellSouth Telecommunications Co., Inc.

32.     In 1996, Congress passed the Federal Telecommunications Act of 1996, codified at 42 U.S.C. § 251, *et seq*.

33.     In 1996, the Memphis City Council passed Ordinance No. 4404....

34.     In May 2000, and again in June 2001, BellSouth sent two letters to the City of Memphis....

35.     In July 2000, the [Memphis] City Council enacted Substitute Ordinance No. 4783 extending Ordinance [No.] 3037 for a term of 12 months or until BellSouth agreed to accept Ordinance No. 4404, whichever was sooner....

36.     The City has placed the revenues that it has received under Ordinance No. 3037 and as extended into its General Fund.

The ordinance at the heart of the dispute in this matter, Ordinance No. 4404 ("Ordinance 4404"), mandates that a telecommunications service provider obtain or enter into a franchise agreement with the City for the right "to construct, maintain and operate a telecommunications system [in the public rights-of-way] ... within the City of Memphis." Pursuant to the franchise agreement, a telecommunications service provider is required to pay to the city as "general compensation," an amount equal to five percent of the corporation's "gross revenues for each quarter of a compensation year...." The precise language of the ordinance reads in pertinent part as follows:

**Sec. 10-78.  Grant of franchise.**

(1) No person shall acquire, construct, expand, reconstruct, maintain, use and operate in, along, across, on, over, through, above and under the public streets, alleys and rights-of-way of the city, a telecommunications system without first obtaining a non-exclusive, revocable franchise from the city.  Except to the extent that the federal or state government acquires or assumes exclusive jurisdiction over the regulation of fiber optic or other telecommunications franchises.  Grantee agrees that it shall not now or at any time after a franchise agreement is granted challenge the city's right to regulate any grantee's use of the public rights-of-way or to be compensated,

-7-

as hereinafter provided, for the use of public rights-of-way in any state or federal court. Accordingly, any franchise granted hereunder shall remain in full force and effect as a binding contract between the grantee and the city. Notwithstanding the foregoing[,] [g]rantee is not prohibited from challenging the city's arbitrary and capricious exercise of its police powers in the regulation of any franchisee's use of the public rights-of-way hereunder.

*******************************************************

(2) Franchise grant conditions, terms.

a.      A franchise granted hereunder ... shall be granted only by ordinance....

b.      Grantee shall not provide cable services or operate a cable system as defined in the Cable Television Consumer Protection and Competition Act of 1992 (47 U.S.C.A. § 521, et seq., as amended) or as recognized by the FCC without first obtaining a separate cable franchise from the city and shall not allow the use of the system by a cable system that has not been granted a franchise by the city. Nor shall any provider of cable services or grantee of cable television service operate or provide a telecommunications franchise pursuant to this division, unless a separate telecommunications franchise is obtained from the city.

*******************************************************

**Sec. 10-79.  Application of other laws....**

(2) ***Subject to police power***.  The construction, expansion, reconstruction, excavation, use, maintenance and operation of the system shall be subject to all lawful police regulations of the city and performed in accordance with all ordinances, laws, resolutions and regulations of the city for utility location and excavation in public rights-of-way presently in effect or hereafter adopted....

Nothing in this division shall be construed as preventing the City of Memphis, whenever it shall be empowered by applicable state

and federal law so to do, from fixing or regulating the rates, rentals, charges, services, facilities and equipment of grantee or from exercising general supervision and regulation of, jurisdiction and control over, a telecommunication franchise, the grantee, and its property, property rights, facilities and franchises located within the city. It being the intention of this division, that the City of Memphis in no way surrenders such general powers it may now have, or may hereafter have or acquire.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Sec. 10-96. General compensation to the city.**

(1) *General compensation*. The city finds that the public streets, alleys and public rights-of-way to be used by grantee in the operation of its system within the boundaries of the city are valuable, public properties, acquired and maintained by the city at great expense to its taxpayers, and that the grant to grantee of the use of said public street, alleys and public rights-of-way is a valuable property right, without which the grantee would be required to invest substantial capital in public right-of-way costs and acquisitions; the grantee agrees to pay to the city as general compensation during each year of the franchise agreement, an amount equal to five (5) percent of gross revenues for each quarter of a compensation year....

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Sec. 10-98. Term of franchise.**

(1) *Term.* Within thirty (30) days after adoption of an ordinance granting a telecommunications franchise pursuant hereto[,] [g]rantee shall execute an agreement accepting this franchise substantially in the form attached hereto as Exhibit "A" [codified as section 10-111]. In the event any such franchise agreement is not executed by a grantee within said thirty (30) days, the award of the telecommunications franchise shall be null and void. Upon execution of a franchise agreement between the city and grantee, a franchise shall be in full force and effect for a term and period of twenty (20) years, ending on the anniversary date of the franchise.

On June 25, 2001, BellSouth filed a nine-count complaint for declaratory relief against the City, seeking to permanently enjoin enforcement of Ordinance 4404 and to declare said ordinance invalid. BellSouth's complaint alleges, in pertinent part:

**DECLARATORY RELIEF**

15.    BELLSOUTH seeks declaratory relief because the CITY is seeking to enforce Ordinance No. 4404, which BELLSOUTH contends conflicts with existing state and federal law and impinges BELLSOUTH's constitutional rights. Specifically, the ordinance (a) is preempted under state law, (b) is preempted under federal law, (c) violates the United States and Tennessee Constitutions; and (d) imposes an illegal fee that the CITY has no power to assess.

*****************************************************

18. . . .By Acts 1905, Ch. 54, MEMPHIS was given the power to enter into franchises only with commercial railroads, street railroads, gas companies, electric light companies, water companies and other quasi-public companies. Telephone and telegraph companies were intentionally omitted from this list of companies to which the CITY could award a franchise because such companies were already entitled to a statewide franchise. In the case of BELLSOUTH, it received its statewide franchise in 1885 pursuant to Acts of 1885, Chapter 66 (now codified at T.C.A. § 65-21-201, et seq. and § 65-21-107 as amended).

*****************************************************

21.    Pursuant to Tennessee Acts of 1885, Chapter 66 (now codified at T.C.A. § 65-21-201, et seq. and § 65-21-105, 106), BELLSOUTH (through its predecessors in interest) was granted a perpetual, statewide franchise in 1885 that extends to BELLSOUTH a right to construct its telephone lines along, upon, above and under the roads or highways within the limits of the [S]tate of Tennessee.

22.    BELLSOUTH accepted the statewide franchise by constructing and extending its telephone lines and facilities along, upon, above and under roads and highways within the limits of the State and has relied on the franchise when expending hundreds of millions of dollars necessary for the infrastructure to provide high quality telecommunications service...

23.    BELLSOUTH has, by accepting the statewide grant, obtained a vested contractual and property right to construct its telecommunications lines along, upon, above, under and over the roads and highways within the limits of the State.

*****************************************************

25. BELLSOUTH's statewide franchise is a constitutionally recognized and protected contract, the obligation of which is protected from interference or impairment by the State or its political subdivisions.

26. Ordinance No. 4404 seeks to impose extensive regulatory requirements and fees that go far beyond that which is permitted under BELLSOUTH's statewide franchise...

27. Because, and to the extent that, Ordinance No. 4404 purports to impose obligations on BELLSOUTH that conflict with and exceed its obligations under its perpetual statewide franchise, the Ordinance impairs and abrogates BELLSOUTH's contractual rights in violation of U.S. Const. Art. I, § 10 and Tenn. Const. Art. I, § 20. In addition, it impairs vested property rights, thereby violating due process, U.S. Const. amend. XIV and Tenn. Const. Art I, § 8.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

30. T.C.A. § 65-21-103 expressly restricts the fees that municipalities may impose upon telephone companies pursuant to the municipalities' police powers. Under T.C.A. § 65-21-103, the CITY can supervise BELLSOUTH's conduct in the public rights-of-way under the CITY's police power and can recover from BELLSOUTH, the cost of such supervision, but nothing more. Accordingly, any fee or rental that is charged pursuant to a municipality's police powers must be limited to the cost to the municipality of supervising BELLSOUTH's use of the municipality's rights-of-way and cannot be based on a telephone company's gross revenue.

In Ordinance No. 4404, MEMPHIS purports to impose upon BELLSOUTH a fee based on BELLSOUTH's gross revenue that is not related to the CITY's cost of policing the use by BELLSOUTH of the CITY's rights-of-way. The gross revenue fee imposed by Ordinance No. 4404 is unlawful because it exceeds the limited range of police powers granted to Tennessee municipalities in regulating telephone companies.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

36. The gross revenue fee imposed by Ordinance No. 4404 constitutes a tax under Tennessee law because it is not limited to the

-11-

fee permitted by T.C.A. § 65-21-103, but was imposed primarily for the purpose of raising general revenue to support the CITY's operations, and would generate income to MEMPHIS beyond that necessary to compensate MEMPHIS for its police power regulation and management of its public rights-of-way.

37.     Because the gross revenue fee imposed by Ordinance No. 4404 constitutes a tax on the privilege of operating as a public utility to conduct a telephone and telecommunications business in MEMPHIS it unlawfully infringes on the exclusive power of the state to impose a privilege tax on public utilities.

*****************************************************

42. Because the gross revenue fee imposed by Ordinance No. 4404 attempts to raise general revenues to support generally the CITY's operations, was imposed primarily for the purpose of raising general revenue to support generally the CITY's operations in other areas, is not limited to the costs to the CITY of policing        BELLSOUTH's use of the CITY's public rights-of-way, and would generate income to the CITY beyond that necessary to compensate the CITY for its police power regulation and management of its public rights-of-way, it constitutes an unauthorized and unlawful tax.

*****************************************************

47.     The Tennessee Legislature has never passed general legislation authorizing MEMPHIS or any other municipality in the [S]tate of Tennessee, to impose on BELLSOUTH or any other telecommunications provider, a general use tax.

48.     Because the gross revenue fee imposed by Ordinance No. 4404 attempts to raise general revenues to support generally the CITY's operations, was imposed primarily for the purpose of raising general revenue to support generally the CITY's operations in other areas, is not limited to the costs to the CITY of policing BELLSOUTH's use of the CITY's public rights-of-way, and would generate income to the CITY beyond that necessary to compensate the CITY for its police power regulation and management of its public rights-of-way, it constitutes an unauthorized and unlawful tax.

*****************************************************

-12-

56. The Ordinance imposes a third tier scheme of regulation upon BELLSOUTH that affects BELLSOUTH's ability to provide the services it is required to provide under the Federal Communications Act of 1934 and the Federal Telecommunications Act of 1996, thereby interfering with interstate and foreign communications by wire and improperly constructing barriers to competition.

The City filed an answer and counter-complaint in response, denying all causes of action and asserting several affirmative defenses, including estoppel and waiver. The City's counter-complaint sought enforcement of the ordinance, ejectment of BellSouth from the City's public rights-of-way, and entry of a judgment ordering BellSouth to compensate the City for "underpayments from excluding inter-exchange access fees as well as any other exclusion of revenue from its gross receipts paid to the City," and further directing BellSouth to "pay for its continued use and occupation of the City's right of way pursuant to the terms of the 1980 franchise agreement, and that the remaining terms of the 1980 franchise agreement be enforced pending the resolution of this matter."

On August 24, 2001, the City filed a motion to dismiss pursuant to Tenn. R. Civ. P. 12.02 for failure to state a claim upon which relief can be granted. In April 2002, BellSouth filed an amended complaint adding claims entitled "State Law Preemption Under the 1995 State Act" and "Violation of BellSouth's Federal Rights Under 42 U.S.C. § 1983 & 1988," and amending its claim of federal preemption under the Telecommunications Act of 1996.

The parties filed joint stipulations of fact in late July 2002. Soon thereafter, the parties filed cross-motions for summary judgment. A hearing was held on December 20, 2002 on the parties' motions, joint factual stipulations, affidavits, and memoranda. On March 5, 2003, the trial court entered an order granting the City's motion for summary judgment and finding as follows:

> This cause came on to be heard on December 20, 2002, upon the cross-motions for Summary Judgment filed by the parties, joint factual stipulations, affidavits, memoranda and arguments in open court, from all of which
>
> **IT APPEARS** that BellSouth's challenges to certain regulatory provisions in Ordinance No. 4404 have been rendered moot by the City's enactment of Substitute Ordinance No. 4980, which deleted the following challenged provisions from the City's Telecommunications Ordinance: §§ 3.1, 3.2D, 22.1, 22.2, 22.3. 22.5, 22.7, 29, 30 and 28 (regarding transfer of franchise at fair market value).
>
> **IT FURTHER APPEARS** that the parties have agreed to defer argument and disposition of BellSouth's remaining challenges to the regulatory aspects of Ordinance No. 4404 (and/or to

corresponding provisions of Substitute Ordinance No. 4980) until after the appeal of the Court's ruling set forth in paragraph 1 below.

**IT FURTHER APPEARS** that the City has stipulated that it is not levying a tax and that it does not have the authority to levy a tax with respect to the use of the City's Rights-of-Way by telecommunications providers.

**IT FURTHER APPEARS** that the issue of whether the amount of the fee set forth in City Ordinance No. 4404, as amended by Substitute Ordinance No. 4980, is reasonable is not before the Court; the Court, therefore makes no ruling with respect to that issue.

Based on the foregoing agreements and stipulations of the parties, affidavits, pleadings, arguments of counsel and memoranda of the parties, the Court finds and concludes:

1. That the fee imposed by Ordinance No. 4404 is not in conflict with T.C.A. § 65-21-103 or any other provision of Tennessee law.

2. That this decree is final as to the ruling in paragraph 1 above, and that there is no just reason for delay in the entry of a Final Decree and declaration as to that ruling, and that this Final Decree be entered as a final judgment pursuant to Rule 54.02 of the Tennessee Rules of Civil Procedure, because a final adjudication with respect to that ruling by appellate courts of this state may obviate further proceedings or litigation in this matter.

3. That the costs of this cause are assessed against Plaintiff for which execution may issue.

**IT IS SO ORDERED, ADJUDGED AND DECREED.**

BellSouth filed a timely notice of appeal of the court's March 5, 2003 order, and presents for review the sole issue of whether the trial court erred in granting summary judgment in favor of the City on grounds that the "fee imposed by Ordinance No. 4404 is not in conflict with T.C.A. § 65-21-103 or any other provision of Tennessee law."

A motion for summary judgment should be granted when the movant demonstrates that there are no genuine issues of material fact and that the moving party is entitled to a judgment as a matter of law. *See* Tenn. R. Civ. P. 56.04. The party moving for summary judgment bears the burden of demonstrating that no genuine issue of material fact exists. ***See Bain v. Wells***, 936 S.W.2d 618, 622

-14-

(Tenn. 1997). On a motion for summary judgment, the court must take the strongest legitimate view of the evidence in favor of the nonmoving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence. *See id*. In *Byrd v. Hall*, 847 S.W.2d 208 (Tenn. 1993), our Supreme Court stated:

> Once it is shown by the moving party that there is no genuine issue of material fact, the nonmoving party must then demonstrate, by affidavits or discovery materials, that there is a genuine, material fact dispute to warrant a trial. In this regard, Rule 56.05 provides that the nonmoving party cannot simply rely upon his pleadings but must set forth *specific facts* showing that there is a genuine issue of material fact for trial.

*Id*. at 210-11 (citations omitted) (emphasis in original).

Summary judgment is only appropriate when the facts and the legal conclusions drawn from the facts reasonably permit only one conclusion. *See Carvell v. Bottoms*, 900 S.W.2d 23, 26 (Tenn. 1995). Since only questions of law are involved, there is no presumption of correctness regarding a trial court's grant of summary judgment. *See Bain*, 936 S.W.2d at 622. Therefore, our review of the trial court's grant of summary judgment is *de novo* on the record before this Court. *See Warren v. Estate of Kirk*, 954 S.W.2d 722, 723 (Tenn. 1997).

The material facts upon which BellSouth's complaint is based are not disputed by the parties. Our review is therefore limited to a determination of whether the trial court erred, as a matter of law, in concluding that the five percent fee imposed by Ordinance 4404 "is not in conflict with T.C.A. § 65-21-103 or any other provision of Tennessee law."

Proper review of this issue require us to consider, first, whether the City has the power or right to require BellSouth to enter into a franchise agreement providing for payment of general compensation to the city for use of the public rights-of-way. If the answer is no, no further analysis is required and the trial court's grant of summary judgment in favor of the City must be reversed. However, if we determine that the City is entitled to require telecommunications service providers such as BellSouth to enter into franchise agreements directing payment of general compensation for use of the public rights-of-way, then we must next consider whether the fee imposed pursuant to Ordinance 4404 is valid.

To briefly reiterate, the Chapter 11, Section 3 of the 1879 Tennessee Acts granted the City the following pertinent powers:

> to repair and keep in repair, streets, side-walks, and other public grounds and places in the taxing district; to open and widen streets, to change the location or close the same, and to lay off new streets

and alleys when necessary; ***and to have and exercise entire control over all streets and other public property of the taxing district, as well as that within and without the taxing district. And they shall have power over all other affairs in the taxing districts in which the peace, safety or general welfare of the inhabitants is interested.***

(emphasis added).

Approximately six years later, in 1885, the Tennessee General Assembly enacted Chapter 66, Acts of 1885, now codified at T.C.A. §§§ 65-21-105 106, and 201. Section 201 states:

> **65-21-201. Rights-of-way authorized. –** Any person or corporation organized for the purpose of transmitting intelligence by magnetic telegraph or telephone, or other system of transmitting intelligence the equivalent thereof, which may be invented or discovered, may construct, operate, and maintain such telegraph, telephone, or other lines necessary for the speedy transmission of intelligence, along and over the public highways and streets of cities and towns, or across and under the waters, and over any lands or public works belonging to this state, and on and over the lands of private individuals, and upon, along, and parallel to any of the railroads, and on and over the bridges, trestles, or structures of such railroads.

Municipalities are endowed with proprietary and governmental powers. *See Memphis Power & Light Co. v. City of Memphis*, 112 S.W.2d 817, 820 (Tenn. 1937) (quoting 43 C.J. 179-182); *City of Chattanooga v. BellSouth Telecomm., Inc.*, No. E1999-01573-COA-R3-CV, 2000 WL 122199 (Tenn. Ct. App. Jan. 26, 2000) (citing *Bristol Tennessee Housing Auth. v. Bristol Gas Corp.*, 407 S.W.2d 681 (Tenn. 1966)). In *Memphis Power & Light Co. v. City of Memphis*, 172 Tenn. 346, 112 S.W.2d 817 (Tenn. 1937), the Tennessee Supreme Court recognized:

> While in a general sense the functions of municipal corporations are all of a public nature, it is well recognized and generally established that a municipal corporation acts in, or possesses, a dual capacity [...] exercising correspondingly twofold functions, two classes of powers, two classes of rights, and two kinds of duties. In one of these dual capacities, considered as an agency of the state, the corporation exercises functions and powers, possesses rights, and has imposed upon it duties variously designated as public, legislative, political, or governmental, and acting in this capacity a

> municipality acts as a sovereignty. In the other of these dual capacities, not considered as an agency of the state, the municipal corporation exercises functions and powers, possesses rights, and has imposed upon it duties variously designated as private, quasi-private, proprietary, business, commercial, ministerial, or merely municipal; and acting in this capacity the municipality acts as a private or quasi-private corporation, enjoying powers and privileges conferred for its own benefit.... [T]he two [classes of powers] are clearly separate and distinct, and the functions of the corporation in its legislative or governmental capacity should not be confused with its functions in its proprietary capacity....

*Id*. at 820 (quoting 43 C.J. 179-182).

Control of the public streets and highways of this State resides primarily with the legislature; however, this power may become vested in a municipality where delegated by proper legislative authority. *See City of Chattanooga v. Tennessee Elec. Power Co.*, 172 Tenn. 524, 112 S.W.2d 385, 388 (Tenn. 1938) (citations omitted); *Lewis v. Nashville Gas & Heating Co.*, 162 Tenn. 268, 40 S.W.2d 409, 411 (Tenn. 1931). Where control of the streets and public rights-of-way is properly delegated and vested in a municipality, "[t]he general rule is that a city or town holds its streets in a proprietary and not a governmental capacity, and its duty to construct and maintain them is a corporate duty and not a governmental function." *City of Nashville v. Brown*, 157 S.W.2d 612, 615 (Tenn. Ct. App. 1941) (citing *Fleming v. Memphis*, 126 Tenn. 331, 337, 148 S.W. 1057, 42 L.R.A.,N.S., 493, Ann. Cas.1913D, 1306; *Shepherd v. City of Chattanooga*, 168 Tenn. 153, 155-157, 76 S.W.2d 322; *City of Knoxville v. Gervin*, 169 Tenn. 532, 538, 89 S.W.2d 348, 103 A.L.R. 877; *Boyd et ux. v. City of Knoxville*, 171 Tenn. 401, 405, 104 S.W.2d 419). *See also City of Greenfield v. Butts*, 582 S.W.2d 80, 83 (Tenn. Ct. App. 1979) (citations omitted).

Chapter 11, Section 3 of the 1879 Tennessee Acts granted the City "entire control" over all Memphis streets. In *City of Memphis v. Postal Tel. Cable Co.*, 145 F. 602 (6th Cir. 1906), the Sixth Circuit found that 1885 Act did not repeal the power of control of Memphis streets, stating:

> ... Again, there are certain special reasons for thinking that the Legislature could not have intended to displace the 'entire control' of the streets which it had committed to the city. No one doubts, we suppose, that the power to charge a telegraph company with a proportion of the cost of making and keeping in repair and policing a street of the city was lodged somewhere. And if so, no place was so appropriate for lodging it as in the city itself. It alone was obliged

to bear the whole cost of maintenance. The share of the cost of maintenance for public use belonged to the city. The share due from the telegraph company for its special use was also due to the city, for the latter was carrying it, and its treasury should be reimbursed. It was a local matter and could be most conveniently attended to by the officials of the municipality who would be best informed of the circumstances and by all analogies the proper persons to assess and collect the charge. It would belong to no other public fund. It was therefore perfectly reasonable that the city should possess the authority to make and collect such a charge, and rather unreasonable that it should be committed to any other depositary of governmental authority. And there is no machinery provided by statute for the levy and collection of such charges by the state, and there was none when the Legislature passed the act of 1885. These seem to us strong reasons for believing that the Legislature had no intention of reserving to the state the power to charge the telegraph company for its proportion of the cost of maintaining the streets of the city of Memphis, but rather that it intended to leave that matter with the authority to which it had granted the power of control possessed by the state. The grant of 'entire control' seems even a more absolute delegation of power than the power 'to regulate,' which was held in ***St. Louis v. Western Union Tel. Co.***, 148 U.S. 92, 13 Sup.Ct. 485, 37 L.Ed. 380, and 149 U.S. 465, 13 Sup. Ct. 990, 37 L.Ed. 810, to authorize the city of St. Louis to assess and collect a like charge for the use of the streets for the maintenance of the structures of a telegraph company. Indeed that case, if we are right in thinking that the Tennessee Act of 1885 did not deprive the city of the control of its streets in this regard, is ample authority for holding that it had power to levy and collect the charges in question, the reasonableness of them not being now disputed; and the case of ***Postal Telegraph Co. v. Baltimore***, 79 Md. 502, 29 Atl. 819, 24 L.R.A. 161, affirmed by the Supreme Court of the United States in 156 U.S. 210, 15 Sup. Ct. 356, 39 L.Ed. 399, is directly in point. See also further discussion of the subject in ***Western Union Tel. Co. v. Borough of New Hope***, 187 U.S. 419, 23 Sup. Ct. 204, 47 L.Ed. 240, and ***Atlantic & Pacific Tel. Co. v. Philadelphia***, 190 U.S. 160, 23 Sup. Ct. 817, 47 L.Ed. 995, and in ***Western Union Tel. Co. v. Pennsylvania R.R. Co.***, 195 U.S. 566, 25 Sup. Ct. 133, 49 L.Ed. 312.

*Id*. at 605-606 (emphasis added).

The court specifically noted that the responsibility of the companies was the relative cost to the city and that was a matter under its public power. Although control of Memphis streets and public rights-

of-way was properly delegated to the City pursuant to Chapter 11, Section 3 of the 1879 Tennessee Acts, this control is to be exercised with recognition of the state's grant to the telecommunication provider.

In considering whether the City is entitled to require BellSouth to enter into a franchise agreement for use of the streets and public rights-of-way, we note that Chapter 66 of the Tennessee Acts of 1885, now codified in part at T.C.A. § 65-21-201, gave telephone and telegraph companies a right to construct, maintain, and operate lines "along and over the public highways and streets of cities and towns ... and on and over the lands of private individuals...." The legislature created in telephone companies a property right in the streets and public rights-of-way via the enactment of Chapter 66 (T.C.A. § 65-21-201) *see City of Chattanooga v. Tennessee Elec. Power Co.*, 172 Tenn. 524, 112 S.W.2d 385, 390 (Tenn. 1938) ("A right of way upon a public street, whether granted by act of the legislature, or ordinance of city council, or in any other valid mode, is an easement, and as such is a property right, capable of assignment, sale, and mortgage, and entitled to all the constitutional protection afforded other property rights and contracts") (citations omitted).

BellSouth asserts that the City's ordinance is not authorized by virtue of the 1907 Act codified as T.C.A. § 65-21-103:

> **65-21-103. Local regulation.** – While any village or city within which such [telegraph or telephone] line may be constructed shall have all reasonable police powers to regulate the construction, maintenance, or operation of such line within its limits, including the right to exact rentals for the use of its streets and to limit the rates to be charged; provided, that such rentals and limitations as to rates are reasonable and imposed upon all telephone and telegraph companies without discrimination. No village, town, or city shall have the right to prevent the company from constructing, maintaining, and operating the line within the village, town, or city, so long as the line is being constructed, maintained, or operated within the village, town, or city, in accordance with the reasonable police regulations.

BellSouth challenges the "reasonableness" of the five percent gross revenue charge on two grounds, including (1) that the fee does not bear a reasonable relation to the City's regulatory costs, and (2) that the fee constitutes an unlawful tax.

This Court recently considered a case somewhat analogous to the case before us. In *City of Chattanooga v. BellSouth Telecommunications, Inc.*, No. E1999-01573-COA-R3-CV, 2000 WL 122199 (Tenn. Ct. App. Jan. 26, 2000), the Court considered the appeal of the trial court's judgment in a declaratory judgment action, declaring that the city ordinance was invalid. The ordinance in question required anyone attempting to provide telecommunication services within the City of

Chattanooga would obtain a franchise from the city and would pay a franchise fee of "five percent of its gross revenue to the city each year." This Court, in holding the ordinance invalid because it was not a reasonable exercise of the city's police powers, reversed the trial court. The Court noted that T.C.A. § 65-21-103 permits the city to exercise a rental for the use of the right-of-way under its governmental or police powers and that the city argued that the rental, as used in the statute, would allow for revenue above the mere compensation. To this argument, the Court said:

> The City's urged construction of the term "rental" to allow for revenue above mere "compensation", would enable the City to exact the same charge in its exercise of its police powers as it can in the exercise of its proprietary powers, thereby rendering meaningless our Supreme Court's decisions making the distinction. In Porter v. City of Paris, the Supreme Court held under the City's police powers, the fee imposed must "bear a reasonable relation to the thing being accomplished." 201 S.W.2d at 691. Recently, the Court defined "fee" as that which is "imposed for the purpose of regulating specific activity or defraying the cost of providing a service or benefit to the party paying the fee." *City of Tullahoma v. Bedford County*, 938 S.W.2d 408 (Tenn. 1997).

> \* \* \*

> The City does have the right to be reimbursed for the added cost of repaving more frequently. In Porter, the Court said:

>> The fact, that the fees charged produce more than the actual cost and expense of enforcement and supervision, is not an adequate objection to the exaction of the fees. The charge made, however, must bear a reasonable relation to the thing being accomplished. (Emphasis supplied).

> 201 S.W.2d 688, 691. Thus, while the City may charge a fee beyond the mere repair of its rights-of-way, such fees must bear a reasonable relation to the cost to the City. There is no evidence to support the proposition that the 5% fee will "bear a reasonable relation" to the use of the rights-of-way.

*Id.* at \*3, 4.

We next address BellSouth's argument that the five percent gross revenue charge is an unlawful tax. In *City of Tullahoma v. Bedford County*, 938 S.W.2d 408 (Tenn. 1997), the Tennessee Supreme Court distinguished a tax from a fee, noting:

-20-

A tax is a revenue raising measure levied for the purpose of paying the government's general debts and liabilities. ***Memphis Retail Liquor Dealers' Ass'n v. City of Memphis***, 547 S.W.2d 244, 245-46 (Tenn. 1977). ***See City of Knoxville v. Lee***, 159 Tenn. 619, 623, 21 S.W.2d 628, 629-30 (1929); 16 Eugene McQuillin, The Law of Municipal Corporations § 44.02 (rev.3d ed. 1994). A fee is imposed for the purpose of regulating a specific activity or defraying the cost of providing a service or benefit to the party paying the fee. ***Memphis Retail Liquor Dealers' Ass'n v. City of Memphis***, 547 S.W.2d at 246; ***Solid Waste Authority v. Division of Natural Resources***, 195 W.Va. 1, 462 S.E.2d 349, 353- 54 (1995); ***Brewster v. City of Pocatello***, 115 Idaho 502, 768 P.2d 765, 768 (1988); ***Crocker v. Finley***, 99 Ill.2d 444, 77 Ill.Dec. 97, 459 N.E.2d 1346, 1349-50 (1984); ***Emerson College v. City of Boston***, 391 Mass. 415, 462 N.E.2d 1098, 1105 (1984).

*Id*. at 412.

It is undisputed that the City is prohibited from imposing taxes upon public utilities, including telephone service providers. *See* T.C.A. §§ 67-4-401, 406.

The franchise agreement set forth by Ordinance 4404 requires BellSouth to pay to the City, "as general compensation during each year of the franchise agreement, an amount equal to five (5) percent of gross revenues for each quarter of a compensation year...." The stated purpose for the general compensation provision is set forth as follows:

> (1) ***General compensation***. The city finds that the public streets, alleys and public rights-of-way to be used by grantee in the operation of its system within the boundaries of the city are valuable, public properties, acquired and maintained by the city at great expense to its taxpayers, and that the grant to grantee of the use of said public street, alleys and public rights-of-way is a valuable property right, without which the grantee would be required to invest substantial capital in public right-of-way costs and acquisitions; the grantee agrees to pay to the city as general compensation during each year of the franchise agreement, an amount equal to five (5) percent of gross revenues for each quarter of a compensation year....

We note that the City acknowledged in its answers to BellSouth's interrogatories that it placed revenue generated under Ordinance 3037 into a General Fund for use in funding various critical services. The City's response, stated in pertinent part below, further indicated that revenue generated pursuant to any franchise agreement is placed in the City's General Fund:

**INTERROGATORY NO. 2**: State whether the City can account for the use of the revenues that it received from BellSouth in any year in which Ordinance No. 3037 was in effect, including the extension period.

**RESPONSE**: The City objects to Interrogatory No. 2 on the basis that it is vague, overbroad and overburdensome. Without waiving said objections, *the City responds that the revenues received pursuant to any franchise agreement with any telecommunications provider doing business within the corporate limits of the City are placed in the City's General Fund, and used to fund various public services, such as public works projects, police and fire protection, parks, libraries, youth programs, and building maintenance.*

(emphasis added).

As we previously pointed out, the Court in *City of Chattanooga v. BellSouth Telecomm., Inc.*, No. E1999-01573-COA-R3-CV, 2000 WL 122199 (Tenn. Ct. App. Jan. 26, 2000) held, *inter alia*, that an ordinance requiring telecommunications service providers to pay a franchise fee of five percent of their gross revenue was not "a reasonable exercise of the City's police powers" under T.C.A. § 65-21-103. *Id*. at *4. The Court specifically rejected the City's argument that the term "rental," as used in the aforementioned statue, was "not limited to the cost of regulation, but allows generation of revenue in excess of regulation without constituting a tax." Thus, the fee in question could properly be termed a tax.

Although the *City of Chattanooga* Court recognized that a municipality has authority to act, either in its proprietary capacity or its governmental capacity, the court did not attempt to enunciate that the municipality's authority to act in light of the 1885 and 1907 Acts would be restricted to purported municipal acts in its proprietary capacity. To the contrary, the 1885 Act merely grants to the telecommunication providers the right to use the streets, etc., of the municipality for the purpose of transmitting its signals. The 1907 Act delineates the authority of municipalities in dealing with the carrier and limits the charges to what is reasonably necessary for the supervision and regulation of its use. This Court aptly pointed out that to construe the term "rental" to allow for revenue above mere "compensation" would enable the City to exact the same charge in its exercise of police powers as it can in the exercise of its proprietary powers, thereby rendering meaningless our Supreme Court's decisions in making the distinction. *City of Chattanooga* at *3.

In the instant case, the City recognizes that it has no authority to tax BellSouth, and argues its five percent fee is a fee and not a tax. However, the record indicates that the revenue derived from such a fee is allocated to different city functions and apparently bears no relation to the cost to the City in supervising and regulating the use of BellSouth's rights-of-way. The fee charged by the City under its police power must bear a reasonable relation of the cost to the City for the use and

maintenance of the rights-of-way.  On its face, the percentage of gross profits bears no relation to the cost to the City.  Therefore, some proof is necessary to establish such a relationship.

Accordingly, we find that the ordinance enacted by the City is invalid as contrary to the state statutes, and the judgment of the trial court is reversed.  City also has argued estoppel and waiver, but our review of the record in this case indicates that neither of these theories are applicable. Costs of the appeal are assessed to the City of Memphis.

_____
W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.