# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
November 8, 2012 Session

## FRED V. WILSON, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF ANNA R. WILSON, DECEASED v. MONROE COUNTY, TENNESSEE ET AL.

### Appeal from the Circuit Court for Monroe County
### No. V08336P      Lawrence H. Puckett, Judge

### No. E2012-00771-COA-R3-CV-FILED-JANUARY 30, 2013

Fred V. Wilson and his wife, Anna R. Wilson, were the initial plaintiffs. They filed suit against Monroe County and the City of Sweetwater alleging that the amputation of Mrs. Wilson's left leg was proximately caused by the negligence of those responding to an emergency call to her home. Mrs. Wilson died before trial and the case proceeded with her husband as the sole plaintiff, individually and in a representative capacity. At a bench trial, the court found that the injury to Mrs. Wilson's left foot occurred during the ambulance ride from the Wilsons' home to the hospital emergency room. It further found that the injury, which did not heal, necessitated the amputation of her leg. The court entered judgment against Monroe County. The claims against Sweetwater were dismissed. Monroe County appeals. The plaintiff, by way of a separate issue, challenges the sufficiency of the court's award of damages. We affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Case Remanded

CHARLES D. SUSANO, JR., P.J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and JOHN W. MCCLARTY, JJ., joined.

Jonathan Swann Taylor, Knoxville, Tennessee, for the appellant, Monroe County, Tennessee.

Jimmy W. Bilbo and Brent J. McIntosh, Cleveland, Tennessee, for the appellee, Fred V. Wilson, individually and as personal representative of the Estate of Anna R. Wilson, deceased.

# OPINION

## I.

Monroe County does not provide a useful statement of the facts in its brief. Instead, it provides us with a 50-page digest of the trial testimony, witness by witness, lawyer by lawyer, page by page, line by line. We have therefore constructed the following summary of the facts after a complete review of the record. In our review, we encountered inconsistent testimony requiring us to consider the trial court's assessment of the credibility of the witnesses. Significantly, we have concluded there is no clear and convincing evidence that would permit us to disturb the trial court's assessment of the credibility of the witnesses. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002)(Great weight is accorded the trial court's determination of witness credibility, and its judgment on this subject will not be disturbed absent clear and convincing evidence to the contrary.). In this case, the court concluded paramedic Harry Bodemann's testimony that Mrs. Wilson's left foot was not injured in the ambulance was not credible because (1) all of the other credible testimony in the record is that she had no injury to that foot when she was loaded into the ambulance, (2) it is undisputed that she had an injury to her left foot when she arrived at the emergency room, (3) it is undisputed that the stretcher came loose inside the ambulance during the ride to the hospital, (4) it is undisputed that Bodemann told the driver to stop the ambulance because of the stretcher coming loose, and (5) the ambulance driver opened the back doors and saw blood in the floor near the foot of the stretcher and later cleaned blood off of the floor. Therefore, in order to avoid some of the minutia, our summary of the facts will focus on the testimony the court found credible as opposed to the testimony it did not find credible.

A Monroe County ambulance was sent to the Wilsons' home in response to a 911 call that reported Mrs. Wilson was having difficulty breathing. The ambulance attendants were Carlene Woods, an EMT, and Harry Bodemann, a paramedic. Woods drove the ambulance to and from the Wilsons' home. They arrived at the home in about five minutes. They first assessed the patient. They found no pulse as well as very shallow and slow breathing. Bodemann administered oxygen and prepared to transport the patient. By the use of a sheet, they transferred Mrs. Wilson from a hospital bed in her home to the stretcher. The loaded stretcher was then pushed through several doors in the home to the open doors of the ambulance. Woods, Mr. Wilson and Anita Wilson, an adult daughter of the Wilsons, all testified that Mrs. Wilson did not sustain an injury to her left foot as she was being rolled through the house to the ambulance. Several Sweetwater city fireman responded to the 911 call. Their only role was to assist in lifting the stretcher into the ambulance. This was necessary because Mrs. Wilson was morbidly obese. Mrs. Wilson was unresponsive when she was loaded into the ambulance.

Bodemann rode in the back of the ambulance with Mrs. Wilson on the trip from her home to the Sweetwater Hospital. In the floor of the ambulance there is a mechanism that locks the bottom of the stretcher in place. Bodemann later testified that he thought the mechanism locked. However, as the ambulance negotiated a hard left turn at the bottom of the Wilsons' steep driveway, the end of the stretcher nearest the door swung to the left prompting Bodemann to direct Woods to stop the ambulance. Woods testified at trial that when she stopped, she opened the back doors of the ambulance and saw blood on the floor near the foot of the stretcher. She also saw Bodemann applying a bandage of some sort to the lower part of the patient's body. Woods testified that she also saw the blood when she later cleaned the ambulance. Bodemann claimed that there was no bandage and no need of a bandage because he caught the stretcher with his own body. Bodemann locked the stretcher in place and directed Woods to "go" directly to the hospital. All witnesses, including Bodemann, agreed that the paramedic is in charge and ultimately responsible for the safety of the patient. This is especially true with regard to the locking of the stretcher to the floor of the ambulance since Bodemann was the person in the back of the ambulance during the transport.

When Mrs. Wilson arrived at the emergency room of the Sweetwater Hospital, she had a large gash on the top of her left foot. She was later transported from the emergency room first by ambulance and then by helicopter to the University of Tennessee Medical Center in Knoxville for treatment of respiratory failure. The foot wound was sutured at UT hospital. After an extended stay at UT, she was admitted to the Sweetwater Nursing Home. The wound was expected to heal, but it did not. It became infected and necrotic.[1] Mrs. Wilson was in pain to the point that her husband described her as "hysterical." The leg was amputated above the knee on or about December 16, 2007. Mrs. Wilson was discharged back to the Sweetwater Nursing Home. She was never able to return home. She died at the nursing home on August 25, 2010. As previously noted, her death came after this action was filed.

One of the issues at trial was the effect of the injury on Mrs. Wilson's level of activity. Mr. Wilson admitted that his wife had many pre-existing health problems preceding the arrival of the ambulance on October 31, 2007. Mrs. Wilson was 73 years of age at that time. Her health problems included diabetes, morbid obesity, stroke, COPD, high blood pressure, and heart attack. In order to cope with her problems, the Wilsons had a hospital bed in the home as well as a wheelchair, and a chair lift. Mr. Wilson testified that, prior to October 31, 2007, Mrs. Wilson was active but he admitted on cross-examination that she adapted her activities to her limitations. For example, she cooked meals from the wheelchair and did

---

[1]Tissue death.

laundry from the wheelchair. She could stand and walk on a limited basis. Mr. Wilson, who is a carpenter by trade, had constructed a ramp to improve his wife's access to the house.

Anita Wilson described her mother's level of activity in more limited terms than did her father. The daughter testified that her mother "didn't do . . . much of nothing." She assisted her mother on a daily basis with such basics as bathing and getting ready for bed. Mrs. Wilson could only walk a few feet unassisted. The witness confirmed that her mother did most of her cooking and laundry from the wheelchair.

Dr. David C. Cassada, who amputated Mrs. Wilson's leg, testified by deposition. He examined Mrs. Wilson on December 16, 2007. That was his first encounter with her. He found "an advanced loss of tissue with an invasive infection that had air and puss, the type of infection that can be quickly life threatening." He immediately moved forward to surgery at UT. He amputated the patient's left leg slightly above the knee. After the surgery, he saw Mrs. Wilson in his office on a number of occasions. He released her on February 28, 2008. By that time, the wound and stump had healed. Dr. Cassada was aware of Mrs. Wilson's earlier admission by way of the subject ambulance ride. In fact, his partner had attended the wound on her foot. Dr. Cassada was familiar with those medical records and relied on them in forming his opinions. Counsel for the plaintiff asked Dr. Cassada for an opinion, stated to a reasonable degree of medical certainty, with respect to the cause of the need to amputate. Counsel for Monroe County objected to the anticipated causation testimony; the court overruled the objection. Dr. Cassada responded to the question as follows:

> Well, I think it began with a wound, and she certainly had some underlying health . . . issues that led to a very poor opportunity to heal that wound, including atherosclerosis, heart disease. I believe I read diabetes in the problem list, also the need for anti-coagulation, poor heart function.
>
> So she had a challenge, which was difficult in terms of having a laceration on her foot. It was difficult to heal that.

Later, Dr. Cassada was asked whether or not all the treatment he provided was reasonable and necessary as a result of the wound. Dr. Cassada responded:

> It was a surgical emergency to remove her leg, and she had an invasive wound that would have taken her life. By extension, if that wound occurred from what was described in the chart, then that was the natural history of that wound.

-4-

On cross-examination, Dr. Cassada admitted that he had not reviewed any medical bills. He also admitted that the wound unexpectedly went from an "uncomplicated" wound to a life-threatening problem. However, this was not altogether unexpected in a patient with Mrs. Wilson's health problems including diabetes. Dr. Cassada was asked about a letter he had written stating that he could not speculate on the etiology of the wound. Dr. Cassada explained that since he did not see the wound at or near the time it happened, he was "reliant on history alone."

During the trial, the parties announced that they were in agreement the case should not be controlled by the Tennessee Medical Malpractice Act. They inquired of the court whether counsel for Mr. Wilson should release his expert, Mr. J. Brett McGill. The court stated it had a concern that an expert should define the standard of care and that it was leaving it to counsel to "proceed however you feel like you all should proceed."

Mr. McGill later testified as an expert witness. McGill is the dean of health science at the Calhoun Community College in Athens, Alabama. Health science includes training of nurses, paramedics, physical therapy assistants, surgical technicians, dental assistants and laboratory technicians. His work is mainly administrative although he occasionally teaches courses. He has been licensed as a certified paramedic since 1988. He has worked primarily out of Athens, Tennessee, and Huntsville, Alabama.

Counsel for Monroe County objected to McGill's qualifications due to a perceived lack of familiarity with Monroe County. The court allowed voir dire as to his qualifications. Prior to this case, McGill had never testified as an expert in Tennessee. He could not identify the type of equipment required on ambulances in Monroe County nor could he state what medications are required on ambulances in Monroe County. His home state of Alabama has one standard that applies statewide, but Tennessee standards vary from county to county and also according to standard orders of physicians. He was not familiar with the licensing requirements for EMTs in Tennessee, nor was he familiar with the rules and regulations applicable in Tennessee to EMTs. On cross-examination, McGill admitted that he had not worked as a paramedic for eight years. Prior to the trial, he had never been to Monroe County. He did not look at the ambulance used to transport Mrs. Wilson, or any other Monroe County ambulance. He has never talked to anyone that has worked for Monroe County or Sweetwater. He formed his opinion in the present case without reviewing any testimony. After voir dire, the court overruled Monroe County's objection and allowed McGill to testify as an expert.

McGill testified that he had worked in communities that are demographically similar to Monroe County but gave no specifics. When asked to state the standard of care for paramedics and EMTs, McGill testified that the standard is to do no harm to the patient.

Thus, if "you do harm a patient you're below the standard of care." McGill, however, proceeded to give more specific standards and deviations. According to him, all emergency responders are responsible for securing the stretcher to the locking mechanism in the back of an ambulance, but the paramedic, as the highest-trained provider on scene, bears overall responsibility. All ambulances have the locking mechanism to secure the stretcher to prevent it from moving from side to side. If the stretcher is not locked, it can hit the wall of the ambulance and injure the patient. McGill stated his opinion that the failure to lock the stretcher was the cause of the injury to Mrs. Wilson's foot. Other than the failure to secure the locking mechanism and the failure to report the injury after it happened, McGill found no fault with the way any of the responders handled the call. According to McGill, the responders in this case properly assessed Mrs. Wilson, stabilized her and probably saved her life.

In its bench ruling, the court found that Mrs. Wilson was not injured while being taken from her bed via the stretcher to the back of the ambulance. It found Mr. Wilson's account of those events as well as that of his daughter to be credible. The court specifically found that Mrs. Wilson's foot was not injured before the ambulance call and that it was not injured by being hit against a wall or door in the house. As to what happened in the ambulance, the court found Woods to be more credible than Bodemann, and therefore rejected his testimony anywhere it conflicted with hers. Based on Woods' account, the court specifically found that the injury happened "inside [the] ambulance when that left turn was made." The court did credit Bodemann's testimony (1) that it is his duty to be sure the stretcher is secure in the ambulance and (2) that the stretcher did move inside the ambulance. The court found that the left turn in combination with the unsecured stretcher caused the stretcher to swing to the left against the inside of the ambulance. The court found that the stretcher "moved with considerable force when it did move." The court did not believe Mr. Bodemann's testimony that he actually stopped the stretcher before it could injure the patient.

The court found that Dr. Cassada's testimony as a whole "was [that] the cut . . . caused the ultimate amputation because it did not heal properly." The court found that "under both counts of medical or common law negligence the finding would be in favor of the plaintiff." Based on approximately 60 days of pain and suffering and loss of a limb with some resulting loss of mobility, the court found compensatory damages to be $150,000. The court awarded Mr. Wilson loss of consortium damages of $50,000. Although the plaintiff reportedly incurred medical expenses of approximately $600,000 from October 31, 2007, forward, the court awarded only those medical expenses related to Dr. Cassada's treatment at UT Hospital in the amount of $32,091.84. A judgment was entered consistent with the court's findings. The judgment also decreed a dismissal of all claims against Sweetwater, claims that were based upon the actions of the Sweetwater firemen who responded. The dismissal of Sweetwater is not at issue in this appeal.

II.

Monroe County raises the following issues, as taken verbatim from its brief:

> Whether the trial court erred in not granting [Monroe County's] motion for directed verdict because the proof failed to establish liability for ordinary negligence or a cause of action under the Tennessee Medical Malpractice Act . . . .

> Whether the trial court erred in allowing testimony of Dr. David C. Cassada on the issue of causation.

> Whether the trial court erred in allowing testimony of J. Brett McGill.

> Whether the trial court erred in awarding medical expenses . . . .

Mr. Wilson raises the separate issue of whether the award of damages is inadequate.

III.

A.

We first address Monroe County's argument that the trial court should have granted a "directed verdict" because, according to Monroe County, even taking the evidence in the light most favorable to the plaintiff, he failed to prove the elements of either medical malpractice or ordinary negligence. The plaintiff correctly points out that "motions for directed verdicts have no place in bench trials." **Burton v. Warren Farmers Co-op**, 129 S.W.3d 513, 520 (Tenn. Ct. App. 2002). The proper motion in a bench trial is a motion for involuntary dismissal pursuant to the provisions of Tenn. R. Civ. P. 41.02(2), which provides, in pertinent part:

> After the plaintiff in an action tried by the court without a jury has completed the presentation of plaintiff's evidence, the defendant . . . may move for dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief . . . .

We can still consider the merits of Monroe County's argument by treating the motion as if it had been one for involuntary dismissal. *See*, **Burton**, 129 S.W.3d at 521. A motion for involuntary dismissal differs from a motion for directed verdict in that a trial court faced with such a motion should

> impartially weigh and evaluate the plaintiff's evidence just as it would after all the parties had concluded their cases and may dismiss the plaintiff's claims if the plaintiff has failed to make out a prima facie case by a preponderance of the evidence.

*Id*. at 520. On appeal,

> [t]his court uses the familiar Tenn. R. App. P. 13(d) standard to review a trial court's disposition of a Tenn. R. Civ. P. 41.02(2) motion because the trial court has used the same reasoning to dispose of the motion that it would have used to make a final decision at the close of all the evidence. Thus, we must review the record on appeal de novo with a presumption that the trial court's findings are correct. We will affirm the trial court's decision unless the evidence preponderates against the trial court's factual determinations or unless the trial court has committed an error of law affecting the outcome of the case. We give great weight to the trial court's assessment of the evidence because the trial court is in a much better position to evaluate the credibility of the witnesses.

*Id*. at 521 (citation omitted).

We conclude that the evidence, at the time the motion was made, supports a finding of liability against Monroe County. The key fact in this case is when and how Mrs. Wilson sustained the injury to her foot. We have already stated that there is not clear and convincing evidence to disturb the trial court's credibility determinations. In fact, the only logical conclusion from the evidence as a whole, and the evidence at the close of the plaintiff's proof, is that Mrs. Wilson's foot was injured when the stretcher moved during a left turn. At the close of the plaintiff's proof, Mr. Wilson had testified, his daughter had testified, and EMT Woods had testified that Mrs. Wilson was not injured when she was put in the ambulance. It is clear beyond any doubt that her foot had already been injured when she was taken out of the ambulance. Woods testified that it was the paramedic's duty to lock the stretcher in place. She had also testified about stopping the ambulance at the direction of the paramedic and seeing blood plus Bodemann applying a bandage to Mrs. Wilson's lower

body. Dr. Cassada had testified as to causation. The defendant was not entitled to a judgment of dismissal either at the close of the plaintiff's proof or at the close of all the proof.

B.

The next logical step is to consider whether this case is a medical malpractice case or an ordinary negligence case. *See Estate of French v. Stratford House*, 333 S.W.3d 546, 554 (Tenn. 2011). Until we do that we are not in a position to determine whether the plaintiff's case failed to meet the standards applicable to a medical malpractice case. The determination whether a case is an ordinary negligence case or a malpractice case is a determination of law for the court. *Id*. at 557. As the Supreme Court stated in *Estate of French*:

> Because medical malpractice is a category of negligence, the distinction between medical malpractice and negligence claims is subtle; there is no rigid analytical line separating the two causes of action. . . . the distinguishing feature between ordinary negligence and medical malpractice cases is whether a plaintiff's claim is for injuries resulting from negligent medical treatment.
>
> *      *      *
>
> If the alleged breach of the duty of care set forth in the complaint is one that was based upon medical art or science, training, or expertise, then it is a claim for medical malpractice. If, however, the act or omission complained of is one that requires no specialized skills, and could be assessed by the trier of fact based on ordinary everyday experiences, then the claim sounds in ordinary negligence.

*Id*. at 555-56 (quotation marks and citations in original omitted).

In footnote 10 of the *Estate of French* opinion, the Court gave the following examples of ordinary negligence versus medical malpractice:

> *See, e.g.*, [*Smartt v. NHC Healthcare/McMinnville, LLC,* No. M2007-02026-COA-R3-CV, 2009 WL 482475, at 9-10 (Tenn. Ct. App., Feb. 24, 2009)](holding that complaint alleging nursing home was negligent with regard to both "custodial

services" and "skilled nursing services" included both ordinary negligence and medical malpractice claims); ***Turner v. Steriltek, Inc.***, No. M2006-01816-COA-R3-CV, 2007 WL 4523157, at *8 (Tenn. Ct. App. Dec. 20, 2007) (determining that alleged error by doctors and hospital in not ensuring surgical instruments were sterilized prior to procedure sounded in ordinary negligence); ***Estate of Doe v. Vanderbilt Univ.***, 958 S.W.2d 117, 121, 122-23 (Tenn. Ct. App. 1997) (concluding that suit was one for ordinary negligence when complaint alleged hospital failed to notify recipients of blood transfusion prior to certain date that blood they received was not tested for HIV); [***Peete v. Shelby County Health Care Corp.***, 938 S.W.2d 693, 696 (Tenn. Ct. App. 1996)](holding that allegation orthopedic suspension bar above hospital bed fell and struck patient in the head sounded in ordinary negligence); ***Franklin v. Collins Chapel Connectional Hosp.***, 696 S.W.2d 16, 20 (Tenn. Ct. App. 1985) (determining that suit claiming that decedent was scalded while being bathed by nursing home orderly should be adjudicated pursuant to common law negligence principles).

We conclude that the determination of whether an ambulance attendant falls below the standard of care by not locking the stretcher in place in the ambulance is a matter that can be assessed on the basis of common experience without the need for expert medical testimony. It is telling that when all was said and done in the present case, there was no dispute that the paramedic was required to lock the stretcher into place; even Bodemann admitted that. His partner, Woods, also said it was his duty. It was also undisputed that all ambulances have such a mechanism that is designed to self-lock. If the failure to secure an orthopedic suspension bar sounds in ordinary negligence, *see* ***Peete***, 938 S.W.2d at 696, so also would the failure to lock a loaded stretcher in place in an ambulance. Therefore, since this case involves ordinary negligence and not medical malpractice, no expert testimony was required and Monroe County's issue alleging deficiencies in Mr. McGill's testimony is rendered moot. But, assuming, solely for the purpose of discussion, that this is a medical malpractice case, the testimony of Bodemann and his partner revealed that their conduct fell below the standard of care. This is true even in the absence of the testimony of Mr. McGill.

C.

We turn now to Monroe County's argument that the plaintiff's proof of causation through Dr. Cassada was purely speculative and should have been excluded. The admission of expert testimony is entrusted to the sound discretion of a trial court. ***McDaniel v. CSX Transp., Inc.***, 955 S.W.2d 257, 263 (Tenn. 1997). We review a trial court's decision to admit or exclude expert testimony under the abuse of discretion standard. ***Shipley***, 350 S.W.3d at 552. Monroe County appears to attack the testimony from the perspective of Dr.

Cassada's lack of personal knowledge that the foot injury happened inside the ambulance. Because medical doctors routinely rely on past medical records of their patients in rendering treatment, and Dr. Cassada testified that he relied upon such "history" for the fact that there was a foot wound on or about October 31, 2007, his lack of personal knowledge of the wound does not make his testimony inadmissible. *See* Tenn. R. Evid. 703.

Monroe County also seems to argue Dr. Cassada only testified that the wound may have caused the amputation rather than that it more probably than not caused the need for amputation. Monroe County is correct that "[i]n order to establish causation, a plaintiff must show that, in the absence of the defendant's negligence, it is more probable than not that the injury of which the plaintiff complains would not have occurred." *Kilpatrick v. Bryant*, 868 S.W.2d 594, 605 (Tenn. 1993). However, Dr. Cassada responded in the affirmative to a question posed in terms of a "reasonable degree of medical probability." Of course, it is not the use of such "magic words" that controls; rather, it is whether the testimony taken as a whole demonstrates it is more probable than not that the negligence caused the injury. *Clifford v. Tacogue*, M2009-01703-COA-R3-CV, 2010 WL 2712534 at *7 n.19 (Tenn. Ct. App. M.S., filed July 8, 2010). The essence of Dr. Cassada's testimony is that the gangrene which necessitated the amputation was a natural progression of the foot wound in a patient with Mrs. Wilson's pre-existing problems[2] and that the foot wound more probably than not necessitated the amputation of the leg. We hold that there was no error in either admitting Dr. Cassada's testimony or in finding that it demonstrated causation by a preponderance of the evidence.

---

[2]In *Elrod v. Town of Franklin*, 204 S.W. 298, 302 (Tenn. 1918), the Supreme Court addressed the negligent infliction of an injury on a plaintiff with pre-existing conditions:

> The liability of one who negligently or unlawfully injures the person of another is not to be measured by the physical strength of the party injured or his capacity to endure suffering. One of weak physical structure, or small vitality, or in ill health, has as much right to protection from violence as a robust athlete, and in either case the physical injury, the bodily harm, which is actually caused by the violence, whether one be strong or weak, healthy or sick, is the natural consequences of the wrong. The defendant is responsible for all ill effects which naturally and necessarily follow the injury in the condition of health in which the plaintiff was at the time of the fall, and it is no defense that the injury might have been aggravated and rendered more difficult to cure by reason of plaintiff's state of health at that time, or that by reason of latent disease the injuries were rendered more serious to her than they would have been to a person in robust health.

D.

Monroe County also makes the argument that the plaintiff failed to prove the reasonableness and necessity of even the UT Hospital bills related to the amputation. These were the only medical expenses that the trial court awarded. Dr. Cassada had not reviewed those bills and did not testify directly that they were reasonable and necessary.

The law places the burden on a plaintiff of "proving that medical expenses the plaintiff is seeking to recover are necessary and reasonable." *Borner v. Autry*, 284 S.W.3d 216, 218 (Tenn. 2009). The plaintiff points out that he relied at trial on the statutory presumption of reasonableness provided by Tenn. Code Ann. § 24-5-113(b)(2000), which provides, in pertinent part:

> [I]n any civil action for personal injury brought by an injured party against the person or persons alleged to be responsible for causing the injury, if an itemization of or copies of the medical, hospital or doctor bills which were paid or incurred because of such personal injury are served upon the other parties at least ninety (90) days prior to the date set for trial, there shall be a rebuttable presumption that such medical, hospital or doctor bills are reasonable.

Monroe County argues that it rebutted any presumption by showing that the bills were not related to any injury caused by either of the ambulance attendants. We have rejected the substance of that argument by finding that there was no fatal defect in the causation testimony of Dr. Cassada.

Monroe County argues further that since Dr. Cassada did not review the UT bill and did not testify explicitly that all the charges in the exhibit were necessary, even if they were reasonable, the plaintiff failed to meet his burden of proof. Our research indicates that medical charges are "necessary" if there is a causal link between the treatment provided and the injury originally inflicted. *See generally*, 9 Tennessee Jurisprudence, *Damages* § 13 (2010). Thus, a party may recover the reasonable costs of diagnostic tests even though the test rules out some particular injury. *Id*. (*citing Newsom v. Markus*, 588 S.W.2d 883 (Tenn. Ct. App. 1979); *Brown v. Chesor*, 6 S.W.3d 479 (Tenn. Ct. App. 1999)). A trier of fact may award less than the undisputed medical expenses upon concluding that something other than the negligence of the defendant caused those expenses. *Karas v. Thorne*, 531 S.W.2d 315, 317 (Tenn. Ct. App. 1975). A party may recover the cost of "future medical treatment caused by the defendant's negligence" that "more probably than not" will be needed. 9 Tennessee

Jurisprudence, *Damages* § 13 (*citing **Palanki v. Vanderbilt University***, 215 S.W.3d 380 (Tenn. Ct. App. 2006)).

Turning to the present case, Dr. Cassada's testimony is clearly to the effect that the original injury to Mrs. Wilson's left foot is what made the amputation necessary. Dr. Cassada testified that the surgery done at UT Hospital to remove the left leg was "a surgical emergency." It is also clear from Dr. Cassada's testimony that he followed Mrs. Wilson's recuperation in the hospital to achieve closure of the wound and later saw her in his office. We conclude that the evidence does not preponderate against the trial court's finding that the plaintiff sustained reasonable and necessary medical expenses related to the UT Hospital admission for amputation of Mrs. Wilson's leg in the amount of $32,091.84.

E.

Monroe County next argues that we should interpret the Good Samaritan Law, Tenn. Code Ann. § 63-6-218 (2010), to insulate it from liability. In pertinent part, The Good Samaritan Law, provides:

> *Any person, including those licensed to practice medicine and surgery and including any person licensed or certified to render service ancillary thereto*, or any member of a volunteer first aid, rescue or emergency squad that provides emergency public first aid and rescue services, *shall not be liable to victims or persons receiving emergency care for any civil damages as a result of any act or omission by such person in rendering the emergency care* or as a result of any act or failure to act to provide or arrange for further medical treatment or care for the injured person, *except such damages as may result from the gross negligence* of the person rendering such emergency care, who in good faith
>
> [r]enders emergency care at the scene of an accident, medical emergency and/or disaster, while en route from such scene to a medical facility and while assisting medical personnel at the receiving medical facility, including use of an automated external defibrillator, to the victim or victims thereof *without making any direct charge for the emergency care* . . . .

(Emphasis added; paragraph numbering omitted.) Monroe County concedes that the language removing the immunity from any provider that makes a "direct charge . . .

seemingly exempts Monroe County EMS from the shield of the Good Samaritan Law." However, Monroe County relies on a Georgia case that held a county ambulance service was immune from liability under a similar statute. *Ramsey v. City of Forest Park*, 418 S.E.2d 432, 434 (Ga. App. 1992). The *Ramsey* court held that the ambulance service received "remuneration" only for the transportation of the victim to and from the scene of an emergency and not for the emergency medical services rendered at the scene. *Id*. We are not persuaded by the logic of *Ramsey*; but, even if we were, the plain language in Tennessee's version of the Good Samaritan Law forecloses such an interpretation. The statute explicitly mentions "emergency care at the scene of [a] . . . medical emergency," as well as "en route." Moreover, in the present case, the trial court specifically found that the injury happened en route to the hospital. We doubt that even the *Ramsey* court would find immunity for an injury sustained during the actual transportation. For these reasons, we find no error in imposing liability on Monroe County for negligence that resulted in an injury in the ambulance in transit to the hospital.

IV.

We turn now to the plaintiff's argument that the trial court awarded insufficient damages. The plaintiff acknowledges that the applicable standard of review requires us to treat the damage award as a finding of fact and to affirm unless "the trial court has adopted the wrong measure of damages or . . . the evidence preponderates against the amount of damages awarded." *Moody v. Lea*, 83 S.W.3d 745, 751 (Tenn. Ct. App. 2001). The plaintiff makes no showing that the trial court adopted the wrong measure of damages. There is no mathematical formula for calculating damages in a personal injury action; rather, the award of damages is left to the discretion of the trier of fact upon consideration of the particular facts of the case. 9 Tennessee Jurisprudence, *Damages* § 13 (2010). We have reviewed the record in its entirety. The trial court's opinion from the bench shows that the court was well aware that the amputation changed Mrs. Wilson's life, but it also shows that the trial court considered the impact of the injury in the context of all the other proof in the case, including significant limitations that pre-existed the injury to her left leg. We hold that the evidence does not preponderate against the amount of damages awarded.

V.

The judgment of the trial court is affirmed. Costs on appeal are taxed to the appellant, Monroe County, Tennessee. This case is remanded, pursuant to applicable law, for enforcement of the judgment and collection of costs assessed by the trial court.

_____
CHARLES D. SUSANO, JR., PRESIDING JUDGE