IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
September 5, 2017 Session

## METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE v. TELEPORT COMMUNICATIONS AMERICA, LLC

**Appeal from the Chancery Court for Davidson County**
**No. 02-679-I, 02-749-III     Russell T. Perkins, Chancellor**

_____

### No. M2016-02222-COA-R3-CV
_____

The Metropolitan Government of Nashville and Davidson County ("Metro") sued Teleport Communications America, LLC ("TCG") in the Chancery Court for Davidson County ("the Trial Court") to recover a fee for TCG's use of Metro's public rights-of-way. TCG contended the fee was unlawful and refused to pay. Metro and TCG previously had entered into a franchise agreement in keeping with an ordinance requiring telecommunications providers to pay 5% of their gross revenues to Metro. The Tennessee Court of Appeals later ruled in another case against an ordinance purporting to set a gross revenue franchise fee as being akin to a tax. The Trial Court cited this holding to invalidate the ordinance in the present case. Metro nevertheless pursued this action further, seeking to recover under a contractual theory. After extensive litigation, the Trial Court found that TCG owed damages to Metro in the amount of $550,000. The Trial Court reasoned that even though the underlying ordinance was invalid, the parties had entered into a franchise agreement and Metro was entitled to some measure of compensation. TCG appealed. We affirm the judgment of the Trial Court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and W. NEAL MCBRAYER, J., joined.

William L. Harbison and John L. Farringer, IV, Nashville, Tennessee, and, Hans J. Germann, Chicago, Illinois, for the appellant, Teleport Communications America, LLC.

Jon Cooper, Director of Law, Law Department of the Metropolitan Government of Nashville and Davidson County, J. Brooks Fox and Lora Barkenbus Fox, Nashville, Tennessee, for the appellee, the Metropolitan Government of Nashville and Davidson County.

# OPINION

## Background

This long-running case began in 2002 when Metro sued TCG seeking to recover franchise fees.[1] TCG asserted that the franchise fees were unlawful and refused to pay them.[2] Years of protracted litigation followed.

In 1997, TCG, a full-service provider of telecommunication services, entered into an agreement with Nashville Electric Service ("NES"), an independent agency of Metro, to install a system of cables. This system would service NES and TCG customers. TCG was to own 50% of the system and NES would own 50%, with NES retaining the option of asserting ownership over TCG's facilities. NES exercised its option to acquire TCG's system in 2002. TCG later conveyed the entirety of the system to NES in 2008, when a Bill of Sale issued. TCG continued to use the system through an indefeasible right of use. In addition to entering the agreement with NES, TCG entered into a franchise agreement with Metro. The franchise agreement included, in keeping with a franchise ordinance, a charge of 5% of TCG's gross revenue in Nashville each year to be paid to Metro. A severability clause in the franchise agreement purported to preserve the remainder of the agreement should any particular provision of the contract be invalidated.

In 2004, during the course of this lawsuit, the Tennessee Court of Appeals entered its opinion in the case of *BellSouth Telecommunications, Inc. v. City of Memphis*, 160 S.W.3d 901 (Tenn. Ct. App. 2004). In *BellSouth*, this Court struck down an ordinance that charged a 5% franchise fee, holding that the fee did not bear a reasonable relation to the city's regulatory costs. The Trial Court applied the *BellSouth* holding in the present case to find that "the gross revenue and dark fiber compensation provisions of the franchise ordinance (§§6.26.230 and 6.26.240) are invalid and unenforceable . . . ."

As a result of *BellSouth* and the Trial Court's ensuing holding regarding the invalidity of the ordinance, Metro changed its legal strategy. Metro sought leave to

---

[1] As a result of a merger, Teleport Communications America, LLC was substituted for the party originally sued by Metro, TCG Midsouth, Inc. Defendant has continued to be referred to as TCG.

[2] Another party, XO Communications Services, Inc., also was sued by Metro, but these parties eventually settled their claims and XO is not a party to this appeal.

amend its complaint to allege that it was entitled to recovery in quasi-contract because, notwithstanding the invalidity of the ordinance, Metro and TCG did enter into an agreement and TCG did receive the benefits under that agreement. In 2007, the Trial Court granted Metro leave to amend. This case was tried in May 2013. The relevant period for which Metro seeks damages is 1997 through 2012.

The record contains substantial evidence as to the parties' respective proposed methodologies for calculating costs. Metro's method involved calculating the total costs for public rights-of-way, then determining which portion was incurred by utilities. Metro then determined that TCG, in 2007, occupied 0.07486% of Metro's rights-of-way. Metro applied indices to arrive at a figure of $1,511,856 in costs owed by TCG. A report entered in the record as Metro's exhibit 11 elaborated upon Metro's allocation of costs as follows:

### 4.2 Pricing Implications

For the reasons explored at some length in the 2010 Reports (e.g., see Part 2.2), TAI [Technical Associates, Inc., a consulting firm retained by Metro] has concluded that the application of a fully-allocated cost ("FAC") methodology based on a cubic feet measure of cost-causation best meets the goals of fairness, reasonableness, and nondiscrimination in the instant case. Further, while an ideal application of FAC methodology involves a distinction between joint/common costs and directly-attributable costs when warranted, TAI has treated all of the PROW costs incurred by Metro as being of a joint-common nature; i.e., to be shared equally among Metro PROW user organizations at the same amount per cubic foot of space that their facilities consume of Metro's PROW. Anecdotal evidence exists that some of the PROW costs incurred by Metro in certain of its Departments are likely to be of a directly-attributable nature. But at the same time, TAI's prior work for Metro also revealed that only through significant additional research might these directly-attributable costs be meaningfully quantified. This finding was confirmed during the recent Event (F) meetings outlined earlier in Part 2.2.

The treatment of all Metro PROW costs during FY2007 as joint/common converted to approximately $4.41 per 1,000 cubic feet in the 2010 Reports. This figure has now risen to $5.05; i.e., $129,018,131/25,559,987 thousand cubic feet per Table 1A(Revised). Thus, and with respect to the flat and one-part rate design discussed in Part 4.7 of the 2010 Reports, the relevant price has become $5.05 per 1,000 cubic feet of Metro PROW space utilization. Upward movements in rates are also applicable to the other potential pricing structures outlined in TAI's

earlier reports. To illustrate, regarding the issue of recognizing the benefits conferred on other Metro PROW user organizations by Metro Stormwater and Metro SL facilities, where a corresponding rate of $5.26 per 1,000 cubic feet was found to be appropriate on Page 57 of the November 15, 2010 Report, this amount has increased to approximately $6.23 per 1,000 cubic feet.

Other than with respect to specific rate levels, all elements of the discussions in Part 4.7 of the 2010 Reports remain unchanged. Put alternatively, while the revisions and corrections incorporated in this 2012 Report have necessarily modified the prices that Metro may appropriately charge for the use of its PROW on a strict cost basis, the various rate design considerations (e.g., goals in addition to cost recovery, balancing among alternative goals, and bill offsets) addressed in the 2010 Reports of TAI remain valid.

(Footnote omitted).

Patricia Kravtin, an expert witness for TCG, advanced a much more restrictive methodological approach. Kravtin testified at trial in part, as follows:

Q. Well, I thought I understood your testimony to be that the only cost that could be re-cooped by local government would be those marginal or incremental costs that are caused by, say in this example, TCG, and, in fact, TCG's impact on the right-of-way?
A. No. That was not my testimony.
Q. Okay. So it's not just that Metro should only recoup the marginal or incremental costs caused by TCG. Is that correct?
A. Well, that wasn't my testimony either. What I indicated was that in my professional opinion as an economist with experience in determining these types of fees for essential assets, that there are benefits, in my opinion. First best would be to set fees just at marginal costs, consistent --
Q. First best --
A. First best consistent with where policy is going in this area, specifically to incentivize and encourage these type of companies to provide broadband deployment.
That said, I recognize that it's been established over the past 30-some years of regulating these types of assets that its accepted to have a fully allocated cost standard, provided that standard is based on cost causative linkages to the use of that rights-of-way and not general excess compensation. So all of those factors governed and were part of the frameworks I applied.

But, again, to be clear, even my lower-bound estimate, it's not an estimate of marginal cost. Because I would determine those on a net basis to be zero. So in terms of being generous and following fully-allocated principles, I developed a lower-bound that includes costs that are more than marginal costs that include some contribution to costs that exist for Metro, whether it had any other entities present in this right-of-way, other than what it would need to perform its basic city function services.

Dr. Michael Ileo, an expert witness for Metro, testified in rebuttal to Kravtin as follows:

Q. Dr. Ileo, you were present during -- were you present during all of Ms. Kravtin's testimony?
A. I was.
Q. And you heard her testify about incremental or marginal costs and how that weighed into her analysis. Can you -- is there anything you want to rebut on that?
A. Ms. Kravtin's statement as to the incremental costs associated with TCG's use of Metro's public of right-of-way is likely at or near zero. It personifies the classic free-rider problem in economics. All of us would like to be able to pay the incremental cost that we impose. That's totally and separately attributable to us for any goods of service. The prices we would pay would be extraordinarily low because individually each of us imposes very few incremental costs in the production of any good or service.

However, there's a whole bucket, since that term has been used a lot in this case, of what is known as common and joint costs that all users of a good or service have to bear on a fair and reasonable basis. Ms. Kravtin's studies are essentially void of any consideration of those common and joint costs. It is true, however, that whereas she poses her lower-bound results as her primary recommendation, she also sets forth mid-range and lower-bound recommendations in which she attributes certain amounts of common and joint costs to TCG and telecommunications.

In September 2016, the Trial Court entered its detailed Memorandum and Final Order. The Trial Court found in favor of Metro and awarded it compensation from TCG, albeit considerably less than what Metro asked for. The Trial Court stated as follows, in part:

Metro's position is that this Court should award it fair and reasonable compensation in the form of franchise fees because it is

undisputed that TCG built and used (for more than ten years) a telecommunications system in Metro's PROW under the parties' contract. In this connection, Metro urges that this Court's ruling (in keeping with two Tennessee Court of Appeals decisions) that the portions of Franchise Agreement and Franchise Ordinance setting the franchise fee at 5% of TCG's gross receipts were unenforceable did not invalidate TCG's payment obligation under the Franchise Agreement and the Franchise Ordinance. Metro is claiming that it is entitled to recover franchise fees under the Franchise Agreement, the Franchise Ordinance and that Tenn. Code Ann. § 65-21-103 ("the 1907 Act") authorizes this recovery. Metro asserts that the federal Telecommunications Act of 1996 (and the attendant prohibition against charging franchise fees retroactively) and the doctrine of separation of powers do not operate to bar its right to recover reasonable franchise fees here. Accordingly, Metro urges that applicable law allows it to recover reasonable franchise fees as damages awarded by the Court.

TCG vigorously disagrees. It urges that the Franchise Agreement and the corresponding Franchise Ordinance were *ultra vires* because they provided for franchise fees (5% of gross revenue) that were not shown to bear a reasonable relationship to the actual cost impact on the PROW. TCG urges that Metro cannot recover any franchisee fees because these fees cannot be saved by any severability concept, this Court's general authority to award damages, or the Tennessee appellate court decisions that generally permit reasonable franchise fees to be recovered. In light of the Federal Telecommunications Act of 1996 (the "federal act"), TCG argues that Metro is not permitted to recover for TCG's use of the PROW given that the 5% franchise fee was declared unenforceable and given that Metro did not publicly disclose the alternative compensation it was seeking by, for example, amending the Franchise Ordinance. Additionally, TCG urges that this Court cannot award reasonable compensation because of separation of powers and, alternatively, that any amount the Court purports to set can only be on a going-forward basis. Further, the parties have fundamental disagreements regarding the appropriate methodology for calculating any such franchise fees.

***

Here, Metro and TCG entered the Franchise Agreement, based on the Franchise Ordinance, which publicly disclosed that the compensation for use of the PROW would be 5% of TCG's applicable gross receipts. As far as the parties actually knew, this was a legally permissible arrangement

at the time, despite TCG's arguments to the contrary. When TCG accepted the benefits of the Franchise Agreement and built and used the fiber optic system in the PROW, it ratified its contractual duty to pay reasonable franchise fees. TCG successfully attacked the fee based on 5% of TCG's applicable gross receipts on the ground that the flat 5% fee could not be shown to be tied to Metro's actual reasonable costs, even though franchise fees are otherwise recoverable under state and federal law. Consequently, when the 5% franchise fee arrangement was declared unenforceable, TCG was subject to the obligation to pay a franchisee fee as long as the fee was reasonable and did not exceed the previously publicly disclosed fee of 5% of TCG's applicable gross receipts. As previously determined by the Court, the fee based on 5% of TCG's applicable gross receipts was not *ultra vires*; it was legally permissible at the time the contract was entered.

If Metro had, for example, passed another ordinance in 2005 after the *Memphis* ruling, TCG may have refused to agree to an amended agreement based on that ordinance and/or taken the position that the amended ordinance could not be applied retrospectively to allow recovery of pre-2005 franchise fees. Further, TCG might have objected to calculation methodologies proposed by Metro for inclusion in the amended ordinance. In the final analysis, the parties may well have been left in the position of having a "battle of experts" trial even if the Metropolitan Council passed an amended ordinance with franchise fee provisions that were later shown to comply with the *Memphis* case.

The language in the Federal Act requiring "publicly disclosed" franchise fees was not designed to allow telecommunications providers to agree to publicly disclosed franchise fees, use the public rights-of-way for several years and escape the responsibility for paying any franchise fees when the fees had been disclosed and agreed upon in terms that were legally permissible at the time of formation. This is especially true where, as here, the telecommunications provider was never prohibited, delayed, or restricted in the use of the PROW. Although rate-making methodologies were offered as proof at trial, the Court is not setting rates here, but, rather, is awarding damages in an amount lower than the amount previously publicly disclosed and agreed to in the Franchise Agreement. Consequently, the Court concludes that awarding Metro fair and reasonable compensation for use of the public-right-of-way is not retroactive rate evoking.

Contracts are subject to local, state, and federal law. All local ordinances are subject to state law. State laws are generally subject to federal law. This Court did not have to wait on Metro to pass a new ordinance before it had authority under the law to determine that the 5% flat

fee was unenforceable or to determine that the Franchise Agreement is enforceable in all other relevant respects. The requirement that changes to the Franchise Agreement be made by ordinance relates to consensual changes to the Franchise Agreement initiated jointly by the parties. The Court concludes that this "amendment by ordinance" provision does not prevent a court from applying the law and determining damages in a contract ( or *quasi-contract*) case where a calculation provision has been declared unenforceable (but legally severable) and where, as here, the Court respectfully declines to allow telecommunication providers to exercise veto power over any franchisee fee sought by a municipality when that telecommunication provider has already received the full benefit of the contracted arrangement.

***

The Court adopts Metro's approach, in part. The Court rejects TCG's methodology to the extent that because it is narrowly tied to the proposition that Metro's franchise fees can only relate to Metro's cost of supervising and regulating TCG's use of the PROW because TCG's approach does not yield franchise fees that bear a reasonable relationship to the actual cost impact on the PROW. Similarly, the so-called "free rider" approach urged by TCG operates as a windfall which intrudes upon Metro's exercise of its police powers and its statutorily delegated authority to supervise and regulate the use of the PROW.

At trial, the parties offered expert proof on how a reasonable franchise fee can be calculated in the event that the Court ruled that Metro could recover. Metro's approach took into account all its costs. TCG's approach was a more focused approach based, in part, on its legal position that if Metro could recover, such a recovery should be tailored to reflect only Metro's cost of supervising and regulating the use of the PROW. Specifically, Metro claimed that TCG owed Metro $1,511,856.00 for use of the PROW from 1997 through 2012. *See* Metro's Post-Trial Brief, p. 1. TCG asserted that if the Court determined, over its vigorous objection, that Metro was entitled to anything, Metro could only recover franchise fees on a going-forward basis. TCG urged, however, in the alternative, that if the Court decided that Metro was entitled to recover franchise fees for the years 1997 through 2012 that the recovery should total no more than $26,618.00 in the aggregate. *See* Post-Trial Brief of Defendant TCG Midsouth, Inc., p. 29.

***

Based on the exhaustive proof offered by Plaintiff's three experts, the Court concludes that Metro's methodology and calculations leads to a range of reasonable fees that satisfy the *Memphis* case, including the full amount Metro is claiming. Here, because it is particularly difficult to determine with precision what a reasonable fee should be here, the Court hereby awards Metro $550,000.00 in the aggregate, as reasonable franchise fees for the entire period addressed by the proof at trial. Because of the uncertainty of the precise amount and because of the vigorously disputed question of liability and amount, the Court concludes that Metro is not entitled to interest which may have occurred prior to the entry of judgment.

(Footnote omitted). TCG timely appealed to this Court.

## Discussion

Although not stated exactly as such, TCG raises the following issues on appeal: 1) whether the Trial Court erred in awarding damages to Metro in light of the fact that the underlying ordinance establishing a 5% gross revenue fee has been held invalid; 2) whether the Trial Court erred in crediting Metro's methodology in determining costs when it did not identify specifically which costs TCG's use of right-of-ways caused Metro to incur; 3) whether the Trial Court erred in finding that Metro could recover any damages from TCG for the period after TCG conveyed ownership of its system to NES; and, 4) Whether the Trial Court's award to Metro was consistent with 47 U.S.C. § 253(c), which, as pertinent, permits a local government to require fair and reasonable compensation for a telecommunications provider's use of the rights-of-way if the compensation is imposed on a nondiscriminatory basis and is publicly disclosed by the local government. Metro raises its own issue of whether the Trial Court erred in awarding roughly only one-third of what Metro sought and presented evidence for in damages.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

We first address whether the Trial Court erred in awarding damages to Metro in light of the fact that the underlying ordinance establishing a 5% gross revenue fee has

-9-

been held invalid. Local governments may use their police powers to assess reasonable compensation for a telecommunication providers' use of the public rights-of-way. A statute from 1907 features prominently in this case. The 1907 Act provides as follows:

> Any village or city within which such line may be constructed shall have all reasonable police powers to regulate the construction, maintenance, or operation of the line within its limits, including the right to exact rentals for the use of its streets and to limit the rates to be charged; provided, that such rentals and limitations as to rates are reasonable and imposed upon all telephone and telegraph companies without discrimination. No village, town, or city shall have the right to prevent the company from constructing, maintaining, and operating the line within the village, town, or city, so long as the line is being constructed, maintained, or operated within the village, town, or city, in accordance with the reasonable police regulations.

Tenn. Code Ann. § 65-21-103 (2015).

In the present case, the franchise fee ordinance was ruled invalid, and Metro does not contest that ruling on appeal. Two key opinions by this Court, *City of Chattanooga v. BellSouth Telecommunications, Inc.*, No. E1999-01573-COA-R3-CV, 2000 WL 122199 (Tenn. Ct. App. Jan. 26, 2000), *no appl. perm. appeal filed*, and *BellSouth Telecommunications, Inc. v. City of Memphis*, 160 S.W.3d 901 (Tenn. Ct. App. 2004), stand for the proposition that a local government may not charge a telecommunication provider a flat gross revenue fee untethered to any actual cost incurred by the city. The United States District Court for Tennessee, Western Division, analyzed the *BellSouth* and *Chattanooga* decisions together as follows:

> First, Level 3 argues that the Use Agreement was not voluntary. Level 3 avers the City initially informed Level 3 that it would not be allowed to install its network facilities on the PROW unless and until it entered into a written agreement. (Compl. ¶ 29.) Subsequently, and as a result of the City's threat to deny the permits Level 3 needed to install its network facilities in the City's PROW, Level 3 contends that it was compelled to enter into the Use agreement with the City on February 25, 2000.

> Second, Level 3 argues that regardless of whether the agreement was voluntary, the City exceeded the bounds of the 1907 and 1885 Acts' provisions. Level 3 concedes that proprietary and governmental powers were granted to the City by the 1869-70 and 1879 Acts. However, Level 3 argues that the 1907 Act limits the proprietary powers of the City, as

-10-

established in the 1869-70 and 1879 Acts, with respect to regulating telecommunication companies' use of the City's PROW.  Level 3 relies on two Tennessee Court of Appeals decisions, *Chattanooga v. BellSouth*, No. E1999-01573-COA-R3-CV, 2000 WL 122199 (Tenn. Ct. App.) (Jan. 26, 2000) and *BellSouth*, 160 S.W.3d 901, in support of that proposition.  In *Chattanooga*, the court considered an ordinance which required anyone attempting to provide telecommunication services within the city of Chattanooga to obtain a franchise from the city and would pay a franchise fee of "five percent of its gross revenue to the city each year."  2000 WL 122199 at * 1.  The court held that the ordinance was invalid because it was not a reasonable exercise of the city's police powers.  The *Chattanooga* court held that the city, "in its proprietary capacity" may "exact a charge for the use of its rights of way unrelated to the costs of maintaining the rights-of-way, but in its governmental capacity, it may only act through an exercise of its police power to regulate specific activity or to defray the cost of providing services or benefit to the party paying the fee." *Chattanooga*, 2000 WL 122199, at *1 (citations omitted).  In *BellSouth*, the court considered Ordinance 4404 which mandates that telecommunications service providers obtain or enter into a franchise agreement with the City for the right "to construct, maintain and operate a telecommunications system [in the public rights-of-way] ... within the City of Memphis." 160 S.W.3d at 905 (citing Memphis City Ordinance No. 4404).  Pursuant to the franchise agreement, a telecommunications service provider is required to pay the City as "general compensation" equal to five percent of the corporation's gross revenues for each quarter of a compensation year. *Id*. The court held that although the City has broad powers under the 1879 Act, it must exercise them "with recognition of the State's grant to the telecommunication provider" in the 1885 Act.  160 S.W.3d at 913.  The *BellSouth* court found that "[t]he 1907 Act delineates the authority of municipalities in dealing with [a telecommunications] carrier and limits the charges to what is reasonable necessary for the supervision and regulation of the [the carrier's] use of the [PROW]." *Id*. at 916.

The City argues that neither the 1885 Act nor the 1907 Act displaced the City's power to enter into contracts regarding its PROW.  The City contends that the *BellSouth* and *Chattanooga* decisions do not hold that the City lacks proprietary power to enter into PROW contracts with telecommunications companies.  Rather, the City posits that both decisions hold that the 1907 Act only proscribes the City from unilaterally dictating the terms of a private utility company's access to the PROWs in the absence of an agreement, such as in a municipal ordinance.  In other words,

the City argues that it is not prohibited from exercising its proprietary powers to enter into PROW contracts, so long as this exercise involves a voluntary agreement between the City and a telecommunications company.

The Court need not determine whether the Use Agreement between Level 3 and the City was voluntary because the City's municipal powers were limited by the 1907 Act regardless of whether the Use Agreement was voluntary. The Court declines to adopt the City's interpretation of the *BellSouth* and *Chattanooga* decisions. Nothing in the text of 1907 Act or the 1885 Act explicitly or by implication refer to limiting the reasonable police powers language to situations in which there is no voluntary agreement. In *BellSouth*, the court cites to the 1907 Act stating that it "expressly restricts the fees that municipalities may impose upon telephone companies pursuant to the municipalities' police powers." 160 S.W.3d at 908. The court did not limit this holding to whether the fees were imposed by a city on the macro level by a city ordinance or on the micro level through individual contracts. This distinction that the City asks the court to make is not in line with the policy behind the 1907 Act. The 1907 Act seeks to limit municipalities' regulation of telecommunication companies. It logically follows that this limit should apply in this case, where the City contends use of the PROW was regulated through an individual contract with a telecommunications company rather than a municipal ordinance. Therefore, the Court finds that the 1907 Act applies in this case and accordingly, limits the City's actions to its reasonable police powers.

\*\*\*

Level 3 has not put forth competent evidence, to establish that the fees imposed on Level 3 do not bear a reasonable relationship to the City's PROW costs. Level 3 asks the Court to make several factual determinations about the reasonableness of the fees based on the terms of the Use Agreement and the City's admissions in prior litigation. At the summary judgment stage, the Court is constrained from engaging in a weighing of the facts or factual determinations. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Determining the reasonableness of the fees is an issue for the fact finder. Because that issue cannot be determined here, summary judgment is inappropriate as to Count III, regarding the reasonableness of the fees imposed.

\*\*\*

Pursuant to Tennessee law, a municipal action may be declared ultra vires for either of two reasons: (1) because the action was entirely outside the scope of the city's authority under its charter or a statute, or (2) because the action was not undertaken consistent with the mandatory provisions of its charter or a statute. *City of Lebanon v. Baird*, 756 S.W.2d 236, 241-42 (Tenn. 1988). "Thus, the law recognizes a difference between the existence of a municipal power and the manner or mode of exercising municipal power legitimately." *Id.* (citations omitted). At issue in this case is whether the City acted within its limits as to the mode of exercising its authority. The Court finds that a genuine issue of material fact remains as to this issue. As discussed above, the reasonableness of fees the City charged Level 3 for use of the City's PROW is an issue of fact that could permit a reasonable jury to return a verdict for the City. The City could reasonably establish at trial that the fees imposed upon Level 3 were within its municipal authority and thus, that the Use Agreement was not ultra vires. Therefore, summary judgment is inappropriate as to Counts I and VI, regarding whether the Use Agreement was ultra vires.

*Level 3 Communications, LLC v. City of Memphis*, No.: 06-02547, 2008 WL 11322104, at *9-11 (W.D. Tenn. July 31, 2008).

Metro submits that, notwithstanding the invalidity of the ordinance, the franchise agreement still must be enforced to the extent its other provisions are lawful. For its part, TCG argues that this case should have ended years ago with the ruling that the ordinance is invalid.

We agree with the Trial Court that the invalidity of Metro's 5% gross revenue franchise ordinance is not totally dispositive of this case. We reject TCG's contention that having received the benefits of the franchise agreement it can escape paying *any* fees. Local governments in Tennessee may charge franchise fees provided they bear a reasonable relationship to cost incurred by the local government. TCG entered with eyes open into a franchise agreement with Metro. That agreement incorporated what only later was held to be an invalid 5% gross revenue fee. TCG, however, knew and agreed from the beginning it would have to pay fees. TCG was not ambushed. As it happened, the ordinance setting the rate is invalid because it sets a gross revenue fee akin to a tax. Because the ordinance later was held invalid does not mean Metro exceeded its authority in establishing a fee in the first place, which TCG agrees it may do. The Trial Court did not judicially establish a new rate. Instead, the Trial Court attempted to effectuate the fee provision of the franchise agreement as best it could in light of the invalidity of the ordinance. The Trial Court did not err in holding that Metro was entitled to compensation pursuant to the franchise agreement.

-13-

We next address whether the Trial Court erred in crediting Metro's methodology in determining costs when it did not identify specifically which costs Metro incurred because of TCG's use of rights-of-way. Metro's method involved calculating the total costs for public rights-of-way, then determining which portion was incurred by utilities. Metro determined that TCG, in 2007, occupied 0.07486% of Metro's rights-of-way. Metro applied indices to arrive at a figure of $1,511,865 of costs owed by TCG. TCG argues that Metro's figure wrongly includes costs for all public rights-of-way, rather than just utilities. According to TCG, Metro's methodology runs afoul of *BellSouth* because it factors in indirect costs. We think TCG misconstrues this Court's holding in *BellSouth* and *Chattanooga*. The standard is one of reasonable relation to the cost to the city for use and maintenance, not just directly incurred costs. The Trial Court heard the evidence and credited Metro's experts and their methodology, which took into account common and joint costs. We find no reversible error on this issue.

We next address whether the Trial Court erred in finding that Metro could recover any damages from TCG for the period after TCG conveyed ownership of its system to NES. TCG argues that since it conveyed its facilities to NES in 2002, or, 2008 at the latest, when the Bill of Sale was issued, it should not be liable for any fees after the conveyance. TCG asserts in its brief that merely sending electrons and lightwaves do not constitute "use" for purposes of the 1907 Act. We believe that which entity owned the cable system when is beside the point. TCG entered into an agreement with Metro to use its public rights-of-way and paying a fee was a term of the agreement. For reasons discussed above, TCG remained liable to pay fees, although not a gross revenue fee as originally agreed to and intended. This liability did not cease with the conveyance of the system to NES because TCG continued to use and enjoy the benefit of the public-rights-of-way through its ongoing use of the system, if not ownership or operation. We find, as did the Trial Court, that pursuant to the terms of the franchise agreement, TCG continued to use the system and remained liable to pay fees so long as it used the public rights-of-way.

We next address whether the Trial Court's award to Metro was consistent with 47 U.S.C. § 253(c), which, as pertinent, permits a local government to require fair and reasonable compensation for a telecommunications provider's use of the rights-of-way if the compensation is imposed on a nondiscriminatory basis and is publicly disclosed by the local government. 47 U.S.C. § 253(c) provides:

**(c) State and local government authority**

Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable

compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government.

In the first instance, we do not find that the Trial Court's award defied the public disclosure requirement of this law because TCG, as did the public, knew when it entered into the agreement with Metro that it would have to pay a fee. The Trial Court observed "the Court is not setting rates here, but, rather, is awarding damages in an amount lower than the amount previously publicly disclosed and agreed to in the Franchise Agreement." Therefore, neither TCG nor the public can claim any surprise or deception.

With respect to non-discrimination, TCG argues that it is discriminatory for the Trial Court to have fashioned essentially a retroactive fee and imposed it on TCG while, for whatever reason, Metro never bothered to pass a valid ordinance. Naturally, had Metro enacted a valid franchise fee ordinance initially or at any time later and TCG paid its fees in conformity with the valid ordinance, it is perhaps less likely either party would have resorted to the courts. On the other hand, as noted by the Trial Court, there is no guarantee this matter would not have wound up in court anyway, resulting in a clash over methodology, rates, and so forth.

TCG's stance also is somewhat contradictory in that, with respect to the methodology issue, TCG objected to Metro's methodology as being too non-specific relative to TCG, but on this issue, TCG actually protests that it is being singled out inappropriately. We reiterate that neither we, nor the Trial Court, have established judicially a new franchise fee. We instead are giving effect to the parties' franchise agreement, including its fee provision, as consistent with current law. We hold that the Trial Court's award did not contravene either the public disclosure or non-discrimination requirements of 47 U.S.C. § 253(c). In short, we cannot accept TCG's position that our General Assembly and Congress intended for a user such as TCG to receive all the benefits of a franchise agreement for free even though it had agreed to pay for those benefits.

The final issue we address is Metro's issue of whether the Trial Court erred in awarding only roughly one-third of what Metro sought and presented evidence for in damages. Metro argues that "this Court should increase the damages to match the 'full amount' owed by TCG for 1997-2012: $1,511,856." TCG, for its part, states: "[I]n the event the Court concludes that Metro was entitled to some recovery, the Court should remand and remit with direction to enter judgment for Metro in an amount not to exceed $26,618 . . . ." Alternatively, TCG suggests: "If the Court further concludes that Metro's

recovery is limited to the 1997-2001 period (as TCG conveyed its facilities in 2002), this amount should be reduced to $9,021."

The Trial Court had this to say with respect to the range of damages: "Metro's methodology and calculations leads to a range of reasonable fees that satisfy the *Memphis* case, including the full amount Metro is claiming. Here, because it is particularly difficult to determine with precision what a reasonable fee should be here, the Court hereby awards Metro $550,000.00 in the aggregate . . . ."

A trial court's award of damages is a question of fact and will be affirmed unless the trial court adopted the wrong measure of damages or the evidence preponderates against the amount of damages awarded. *Wilson v. Monroe County*, 411 S.W.3d 431, 443 (Tenn. Ct. App. 2013) (quoting *Moody v. Lea*, 83 S.W.3d 745, 751) (Tenn. Ct. App. 2001). The Trial Court selected a figure between the low end, that is, $9,021 from TCG's perspective, and the upper end, $1,511,856 from Metro. The Trial Court did not lay out precisely how it arrived at $550,000. However, a range of damages necessarily implies that more than one figure from within that range could legitimately be settled upon, and the evidence does not preponderate against this figure found by the Trial Court. We decline both Metro's and TCG's invitations to choose another figure from the range of damages supported by the evidence. We affirm the judgment of the Trial Court in its entirety.

## Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Teleport Communications America, LLC, and its surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE